STATE EX REL. LEWIS, and another, Petitioners, v. LUTHERAN SOCIAL SERVICES OF WISCONSIN AND UPPER MICHIGAN, Respondent.*

*No. State 12 (August Term, 1970). Argued February 23, 1973.— Decided June 5, 1973.*
(Also reported in 207 N. W. 2d 826.)

* Motion for rehearing denied, without costs, on August 28, 1973.

1

[1] *State ex rel. Lewis v. Lutheran Social Services* (1970), 47 Wis. 2d 420, 178 N. W. 2d 56.

For petitioner Jerry D. Rothstein there were briefs by *William G. Rice* of Madison, and *Robert C. Burrell* and *Borgelt, Powell, Peterson & Frauen,* all of Milwaukee; and oral argument by *Mr. Rice* and *Mr. Burrell.*

For petitioner John Thomas Lewis there was a brief and oral argument by *Bruce C. O'Neill* of Milwaukee, guardian *ad litem* for John Thomas Lewis.

For the respondents there was a brief by *Hamilton & Mueller* of Dodgeville, attorneys for the adoptive parents; a brief by *Ralph von Briesen* of Milwaukee, attorney for Lutheran Social Services of Wisconsin and Upper Michigan, and *Stephen W. Hayes* and *von Briesen, Redmond, Schilling & Kreunen* of counsel, all of Milwaukee; and oral argument by *Frank D. Hamilton* and *Ralph von Briesen.*

HALLOWS, C. J. Perhaps the most important determination to be made is the effect of *Stanley v. Illinois* upon this case. In *Stanley,* the supreme court struck down an Illinois law which made children of unwed fathers wards of the state. Mr. Stanley had lived with a woman not his wife intermittently for some eighteen years, during which time they had three children.[2] Upon the woman's death, these children were placed with guardians. Mr. Stanley fought this placement, claiming a denial of equal protection. In *Stanley,* the supreme court decided two things: (1) That the denial of a natural father's parental rights to a child born out of wedlock based on mere illegitimacy violated his constitutional right to equal protection of the laws, and (2) that the termination of a natural father's parental rights to a

---

[2] In some respects, this could be considered a common-law marriage, but because such marriages are not legally recognized in this state, consideration of such a factor is unimportant in distinguishing *Stanley* from the present facts.

child born out of wedlock without actual notice to him, if he was known, or constructive notice, if unknown, and without giving him the right to be heard on the termination of his rights denied him due process of law.

It is urged that *Stanley v. Illinois* should not be applied to this case, that its ruling should have only prospective effect; we disagree. The very mandate of the United States Supreme Court, which vacated our judgment holding that the petitioner Jerry D. Rothstein had no parental rights, tells us to reconsider the problem of custody in light of *Stanley*. Certainly we cannot validate an adoption when the very holding of *Stanley* was that the denial of the existence of parental rights in unwed fathers is unconstitutional. If custody is to be left with the "adoptive parents," it must rest on grounds other than the adoption decree. There can be no valid adoption without a valid termination of parental rights. *Armstrong v. Manzo* (1965), 380 U. S. 545, 85 Sup. Ct. 1187, 14 L. Ed. 2d 62. *See also: Selman v. Phillips* (1966), 384 U. S. 210, 86 Sup. Ct. 1468, 16 L. Ed. 2d 482.

A distinction must be made between the termination of parental rights and the granting of custody without the termination of parental rights. While it is possible to grant custody in divorce cases without terminating parental rights and perhaps in other cases, it is not possible to give custody based upon adoption without a termination of parental rights. Whether the present persons having custody of John Thomas Lewis would accept custody without adoption is a question not before us; their position is adoption, not custody. We point out it has been held that where an adoption proceeding is void, the "adoptive parents" could be allowed to retain custody where it would be in the best interests of the child. *Fielding v. Highsmith* (1943), 152 Fla. 837, 13 So. 2d 208; *Ex parte Vancuren* (1929), 135 Okla. 91,

274 Pac. 469; *Mathews v. Grant* (Okla. 1958), 326 Pac. 2d 1043. However, other courts have awarded custody to the natural parent upon a successful challenge to the validity of an adoption decree. Thus in *McClary v. Follett* (1961), 226 Md. 436, 174 Atl. 2d 66, where the adoption decree was set aside because the natural father had received no notice due to the mother's false representation of herself as unwed, the child was taken from its "adoptive parents" and awarded to the father. *See also: Hatgimisios v. Smith* (1972), 229 Ga. 475, 192 S. E. 2d 270; *Pole v. Bowen* (Fla. App. 1972), 269 So. 2d 707.

An adoption proceeding is the legal method of creating a new relationship of parent and child; it does not merely determine custody. Sec. 48.92, Stats. In our opinion of October 31, 1972, we stated the parental rights of the petitioner had not been terminated. In some states, adoption proceedings terminate parental rights. Wisconsin takes two independent steps: (1) Termination of parental rights, with temporary custody generally given to a social agency, as here; and (2) adoption. What the mandate of the United States Supreme Court can only mean in view of Wisconsin law is that this court must determine whether the petitioner is entitled to custody which would have been his as a natural father unless his parental rights had been terminated. We point out that there was an injunction against the adoption of John Thomas Lewis while the matter was under consideration of this court, and the child was secretly adopted without notice to this court, the guardian *ad litem*, or the petitioner during the period in which a rehearing motion might have been made to this court. Consequently, when this matter reached the United States Supreme Court on appeal the child had been adopted with full knowledge of the pending litigation and the alleged legal infirmities involved. Under these circumstances, we

cannot hold that the adoption was valid or that *Stanley* is only of academic concern and not applicable.

We do not hold that *Stanley* or the reversal of our decision in *Rothstein* is to be applied retroactively and undercut the basis of other prior adoption proceedings. In this case, the petitioner made his claim known prior to the birth of the child, was kept from knowledge of its birth and its whereabouts, made an application to the court to assert his rights as soon as he learned of the termination-of-parental-rights proceedings, and was denied a hearing. There are few cases pending with facts raising such an issue. *Stanley* applied retroactively only to these facts and to any pending cases where the natural father has been denied rights which he asserted as the petitioner did in this case.

The treatment of *Stanley* as retroactively applicable to this case is in accordance with what at least one other state has done with this same problem. In *People ex rel. Slawek v. Covenant Children's Home* (1972), 52 Ill. 2d 20, 284 N. E. 2d 291, a child born out of wedlock was placed for adoption upon consent of the mother alone and without notice to the putative father. The father challenged the Illinois statutes which precluded fathers of illegitimate children from asserting any rights in adoption proceedings. The Illinois court applied the rule of *Stanley* that putative fathers have a constitutional right to a hearing on their fitness for custody to this pre-*Stanley* adoption and declared the Illinois adoption and paternity acts unconstitutional "insofar as they are in conflict with *Stanley, Rothstein,* and *Vanderlaan v. Vanderlaan,* 126 Ill. App. 2d 410, 262 N. E. 2d 717, vacated 405 U. S. 1051, 92 Sup. Ct. 1488, 31 L. Ed. 2d 787."

In *Vanderlaan,* the Illinois Supreme Court held that a divorced father had no right to custody of his children born subsequent to the divorce. On the same day that it decided *Rothstein,* the United States Supreme Court

vacated the Illinois judgment, but the reports do not show what the Illinois court has done with this case on remand. Other cases citing *Stanley* do not address themselves authoritatively to the question of retroactivity. *See Gomez v. Perez* (1973), 409 U. S. 535, 93 Sup. Ct. 872, 35 L. Ed. 2d 56.[3]

Our present statutes on termination of parental rights are unconstitutional only insofar as they are in conflict with *Stanley, Rothstein,* and *Vanderlaan.* The saving of so much of the statutes as possible is desirable and compatible with the method recognized in *Huebner v. State* (1967), 33 Wis. 2d 505, 147 N. W. 2d 646. To comply with constitutional dictates and until the legislature provides a more adequate procedure,[4] notice for the termination of the natural parental rights of unwed fathers shall be the same as that required to be given to married parents or unwed mothers under sec. 48.42, Stats., upon petition of the state. Petitions made by either unwed parent will now require either personal or constructive notice, as provided in sec. 48.42, to terminate the rights of either or both of the unwed parents. With respect to adoption by consent without formal termination of parental rights, neither sec. 48.84 (1) (b)[5] nor

---

[3] *See also, e. g., LaFleur v. Cleveland Board of Education* (6th Cir. 1972), 465 Fed. 2d 1184, 1187; *Lucas v. Wisconsin Electric Power Co.* (7th Cir. 1972), 466 Fed. 2d 638, 648; *Murry v. U. S. Department of Agriculture* (D. D. C. 1972), 348 Fed. Supp. 242, 243; *Pocklington v. Duval County School Board* (M. D. Fla. 1972), 345 Fed. Supp. 163, 165; *Abele v. Markle* (D. Conn. 1972), 342 Fed. Supp. 800, 802.

[4] Presently under consideration by the legislature are bills redrafting those provisions of the Children's Code which are in conflict with the *Stanley* and *Rothstein* decisions. *See* 1973 Assembly Bill 915; 1973 Senate Bill 566.

[5] "48.84 **Persons required to consent to adoption.** (1) No adoption of a minor may be ordered without the written consent of the following to the adoption of the minor by the petitioner: . . .

sec. 48.84 (3) [6] can be given legal effect. Consent of both the unwed mother and the unwed father, or consent of one parent with proper termination of the parental rights of the other, is necessary.

It is urged by the petitioner, relying on *Ponsford v. Crute* (1972), 56 Wis. 2d 407, 202 N. W. 2d 5, that he is entitled to custody as a matter of law over all other persons because he has been found to be the father and to be fit. A great portion of the briefs submitted in this case deal with the apparent conflict in decisions of this court involving the natural rights of parents in contrast to the so-called "best-interests-of-the-child" test. Of course, in custody cases, as distinguished from parental termination cases, the "best interests of the child" constitutes an important factor, but in *Ponsford* we stated it is not the controlling factor.

The phrase, "best interests of the child," means all things to all people: it means one thing to a juvenile judge, another thing to adoptive parents, something else to natural parents, and still something different to disinterested observers. If judges were endowed with omniscience, the problem would not be difficult; but the tendency in man is to apply intuition in deciding that a child would be "better" with one set of parents than with another, and then to express this intuitive feeling in terms of the legal standard of being "in the best interests of the child." Courts have not laid down any definite guidelines which can be followed in every case

"(b) The mother alone, if the minor was born out of wedlock; provided that consent shall not be required from a mother whose parental rights have been legally terminated; . . ."

[6] "48.84 . . . (3) The consent of the father of a minor born out of wedlock shall not be necessary even though the father has married the mother if, prior to the marriage, the mother's parental rights were legally terminated or she consented to the adoption of the minor . . . ."

to insure protection of what the average person means by "best interests." The term, "powerful countervailing interests," as used in *Stanley*, may mean nothing other than the "best interests of the child." The "best-interests-of-the-child" test does not speak in terms of the present, the immediate future, or even the ultimate future of the child. Nor has it contemplated yet the question of whether the child has a constitutional right to know the identity of his natural parents. Neither this court nor many others have considered studies based upon interviews with persons who were adopted in early life to determine whether credible guidelines can be legally established. *See* A. M. McWhinnie, *Adopted Children—How They Grow Up*. But we think it would be inappropriate for this court to presently decide any preference of fitness or unfitness or give any indication of where the "best interests" of the child lie until that issue is ripe for determination.

We have before us now not the question of present custody but whether the petitioner's rights as a natural parent should be terminated *nunc pro tunc*. This court took a shortcut in the last reference and thus we do have a finding that the petitioner is the father, which fact has not been contested. But the finding of fitness is based upon evidence of current status, whereas we now think the issue of termination of parental rights should be viewed as of the period of time when that issue should have been determined and when the petitioner's constitutional rights were denied him. This would be the date of the judgment in the county court of La Crosse county on November 11, 1969.

Facts found in relation to fitness on the last reference are not binding. This matter must be sent back to the county court of La Crosse county, the termination-of-parental-rights proceeding must be reopened and the petitioner Jerry D. Rothstein must be given a hearing on

the issue of termination of his parental rights under the test laid down in sec. 48.40 (2), Stats.,[7] and in light of sec. 48.01 (2).[8]

[7] "48.40 Grounds for termination of parental rights. The court may, upon petition, terminate all rights of parents to a minor in any of the following cases: . . .

"(2) If it finds that one or more of the following conditions exist:

"(a) That the parents have abandoned the minor; or

"(b) That the parents have substantially or continuously or repeatedly refused or neglected or are unable for a prolonged indeterminate period to give the minor the parental care and protection necessary for his health, morals or well-being; or

"(c) That, although the parents are financially able, they have substantially and continuously neglected to provide the minor with necessary subsistence, education or other care necessary for his health or well-being or have neglected to pay for such subsistence, education or other care when legal custody is lodged with others; or

"(d) That the parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd or lascivious behavior or conviction and confinement for a felony (including hospitalization within the sex deviate statutes), which conduct or status is found by the court to be likely to be detrimental to the health, morals or the best interests of the minor; or

"(e) That the parents, subsequent to a finding of neglect, have failed to correct the conditions leading to such a finding despite reasonable efforts under the direction of the court to rectify the conditions upon which such finding was based; . . ."

[8] "48.01 Title, intent and construction of chapter. . .

"(2) INTENT. It is declared to be the intent of this chapter to promote the best interests of the children of this state through:

"(a) Juvenile courts adequately equipped to review each case on its individual merits under procedures designed to safeguard the legal rights of the child and his parents;

"(b) An integrated and co-ordinated program for all delinquent, neglected and dependent children both in their own community and while in the custody of the state;

"(c) Protection of children from unnecessary separation, either temporary or permanent, from their parents;

"(d) Adequate care and rehabilitation for all children who must be separated from their parents temporarily for the child's protection or that of the public;

We consider the argument that a parent is unable to adequately care for the child if the child's welfare would be harmed by uprooting its present custody to be inapplicable because the child on November 11, 1969, had only been in the temporary custody of the foster parents for a short time. The petitioner should not be faulted because the respondent agency and the adoptive parents have kept the petitioner from seeing his child pending this proceeding. Many social agencies have a ruling that children brought up in foster homes cannot be adopted by such foster parents. Consequently, on this reference, we do not reach the issue of custody as such. The reference is solely on the issue of termination of parental rights as those grounds are expressed in the statutes.

We have read the dissenting opinion, and while it is unusual to comment upon it in the majority opinion, we are compelled to point out that the issues raised in the dissent on the question of estoppel, the completion of the adoption proceedings, and the welfare of the child are not pertinent to the issues decided by the majority. Some of the matters covered by the dissent were neither raised by the briefs nor orally argued and should not at this time be considered by the court. The dissent expressly refuses to recognize that the bond of nature between a parent and a child born out of wedlock should not be less protected by law "simply because her natural father has not married her mother." *Gomez v. Perez, supra.* It likewise ignores consideration of the presump-

---

"(e) Co-ordinated planning to assist local communities in promoting effective programs in health, education, recreation and welfare for the maximum development of all children and for the control of influences detrimental to youth;

"(f) Assurance for children needing adoptive homes that they will be placed in the best home available; protection of children from adoption by persons unfit to have responsibility for raising a child; protection for children who are legally established in adoptive homes from interference by their natural parents."

tion that as between a natural parent and a third party, the "best interests of the child" lie with the natural parents' exercise of custodial rights. *See Garrett v. Mahaley* (Ala. 1917), 75 So. 10; concurring opinion of Justice TRAYNOR in *Guardianship of Smith* (1954), 42 Cal. 2d 91, 265 Pac. 2d 888; *McClary v. Follett, supra; In re Ernst* (1964), 373 Mich. 337, 129 N. W. 2d 430; *Rincon v. Rincon* (1970), 29 Mich App. 150, 185 N. W. 2d 195; *Allison v. Bryan* (1908), 21 Okla. 557, 97 Pac. 282.

*By the Court.*—The judgment of the county court of La Crosse county of November 11, 1969, denying Jerry D. Rothstein a right to be heard, is hereby vacated and the court is directed to hold a hearing on proper notice to both Jerry D. Rothstein and the mother of John Thomas Lewis, and to the guardian *ad litem* Bruce O'Neill, and all other persons appearing in this proceeding to determine the termination of the respective parental rights of the natural parents of John Thomas Lewis. If the mother of John Thomas Lewis is satisfied with the prior termination of her rights, she may consent to the termination of her rights at this hearing. If the parental rights of both parents are terminated and there is to be a review, this court will review the matter upon application in this proceeding. If the parental rights of both parties are not terminated, this court will hear further motions on the issue of custody without adoption.

ROBERT W. HANSEN, J. *(dissenting).* The United States Supreme Court has remanded this case to this court with a threefold mandate:

(1) ". . . for further consideration in the light of *Stanley v. Illinois*," [1]

(2) ". . . with due consideration for the completion of the adoption proceedings,"

---

[1] *Stanley v. Illinois* (1972), 405 U. S. 645, 92 Sup. Ct. 1208, 31 L. Ed. 2d 551.

(3) ". . . with due consideration for . . . the fact that the child has apparently lived with the adoptive family for the intervening period of time."

As to these three mandated areas for court review, the opinion of the majority of this court gives two of them no consideration at all. The majority opinion states: ". . . the completion of the adoption proceedings, and the welfare of the child are not pertinent to the issues decided by the majority." Obviously, what is considered "not pertinent" by the majority of this court was considered relevant and pertinent by the United States Supreme Court. We are directed to give consideration to three aspects of this case, and so we do just that.

(1) *Impact of Stanley decision.*

In *Stanley v. Illinois,*[2] the nation's highest court struck down an Illinois statute under which the children of unwed fathers became wards of the state upon the death of the mother.[3] It rejected a state court holding that an unwed father could properly be separated from his children ". . . upon proof of the single fact that he and the dead mother had not been married. . . ."[4] Insisting upon "individualized determination" rather than "procedure by presumption," it concluded that putative fathers are entitled to a ". . . hearing on their fitness before their children are *removed from their custody. . . .*"[5] (Emphasis supplied.)

Is the petitioner here in the position of Peter Stanley, so that it can be said that a ". . . single fact that he and the . . . mother had not been married . . . ."[6] was relied upon to warrant termination of his parental rights by court proceedings? We think not.

---

[2] *Id.*

[3] *Id.* at page 646.

[4] *Id.* at pages 646, 647.

[5] *Id.* at pages 656, 658.

[6] *Id.* at pages 646, 647.

In *Stanley*, the high court started its opinion by noting that "Joan Stanley lived with Peter Stanley intermittently for eighteen years, during which time they had three children. When Joan Stanley died, Peter Stanley lost not only her but also his children. . . ." [7] In *Stanley*, the three children lived with their father and mother for eighteen years in what some states would recognize as an entirely legal common-law marriage. [8] Their home was the only home the three children ever knew, and their father never denied the fact of his paternity and never refused to accept the responsibilities of his fatherhood.

That cannot be said of the petitioner here. When the mother (of the child that he now claims to be his) first informed him of the fact that she was pregnant, he did not admit that he was the father of the child. Instead, he stated that the mother could have been with other men and he would have no way of knowing it. He not only then, but subsequently, denied paternity, and accused the mother of having had illicit sexual relations with other men. Implicit in such denials of paternity was a refusal to assure financial support for the child as its father. At the hearing before the referee, the mother testified that the petitioner, when informed by her that she was bearing his child, stated: "He told me he was going to see the doctor to make sure I couldn't use his name as the father on the birth certificate." [9]

Clearly, such denial of paternity would be a powerful motivating influence upon the mother to seek court termination of parental rights as a prelude to having the child "put out" for adoption. Nonetheless, under *Stanley,*

---

[7] *Id.* at page 646.

[8] 52 Am. Jur. 2d, *Marriage*, p. 908, sec. 53; Annot. (1925), 39 A. L. R. 538; Annot. (1929), 60 A. L. R. 541; Annot. (1935), 94 A. L. R. 1000; Annot. (1941), 133 A. L. R. 758.

[9] From the transcript, page 89.

the petitioner claims that he was entitled to notice as to the proceedings for termination of parental rights, at least after he changed his mind and decided that he was the father of the child.

A court proceeding for the termination of parental rights is a proceeding in equity.[10] And the law of equity applies to attacks upon such proceedings, as well as to the conducting of them. As to antagonists as well as protagonists, one who seeks equity must do equity. It is the rule in equity that ". . . a litigant may be denied relief by a court of equity on the ground that his conduct has been inequitable . . . as to the controversy in issue. . ."[11] and affirmative relief is to be denied because of such conduct ". . . even though it thereby leaves undisturbed, and in ostensibly full legal effect, acts or proceedings which it would otherwise set aside."[12]

It has been said that the "no polluted hand shall touch" maxim[13] is ". . . most applicable when a party seeks to take advantage of an act or omission which he has himself induced . . . ."[14] That exactly describes the situation here. When the defendant denied paternity, accused the mother of intercourse with others, and stated he would take steps to see that his name did not appear on the birth certificate as the father, he placed himself in a position where he could not in equity attack the lack of notice to him that would otherwise have been required in the termination of parental rights proceedings in court. All requirements of estoppel being present,[15] he was, by his conduct, equitably estopped from

[10] *See:* 43 C. J. S., *Infants,* p. 51, sec. 5; 42 Am. Jur. 2d, *Infants,* pp. 27–29, secs. 22 and 29.

[11] 27 Am. Jur. 2d, *Equity,* p. 667, secs. 136 *et seq.*

[12] *Id.* at page 667.

[13] *Id.* at page 670.

[14] *Id.* at page 670.

[15] *Gabriel v. Gabriel* (1973), 57 Wis. 2d 424, 429, 204 N. W. 2d 494, stating, "The tests for applicability of equitable estoppel as a defense derive from the definition by this court of such estoppel to be: '. . . action or nonaction on the part of the one against

attacking the validity of the termination of parental rights judgment on the ground of lack of notice.

## (2) *Completion of adoption proceedings.*

We are directed by the United States Supreme Court to act with "due consideration for the completion of the adoption proceedings." This could be read as a high court mandate for a balancing of rights approach which would take into consideration the fact that the adoptive parents have provided love, care, affection and support to the child they took into their family circle. The completion of the proceedings gave to the adoptive parents a legal status and interests countervailing to those of the petitioner. In *Stanley,* after the death of the mother, there was no one, except the father, who had ever stood in the role of parent to the three children involved. The high court stated that "[t]he private interest here, that of a man in the children he has sired *and raised,* undeniably warrants deference and, *absent a powerful countervailing interest,* protection. . . ." [16] (Emphasis supplied.) Here the fact of adoption and time spent with the adoptive parents certainly constitutes a "powerful countervailing interest" which is to be given consideration.

However, we see the high court's reference to "completion of the adoption proceedings" as referring primarily to the proceedings rather than to consequential rights of the adoptive parents. Subject to statutory rights of appeal, finality is a goal to be sought in all legal proceedings. It is particularly so in cases involving adoption of infants. The reason goes beyond encouraging

---

whom the estoppel is asserted which induces reliance thereon by another, either in the form of action or nonaction, to his detriment. . . .' Three facts or factors must be present: (1) *Action or nonaction* which induces (2) *reliance* by another (3) to his *detriment.*" Quoting *City of Milwaukee v. Milwaukee County* (1965), 27 Wis. 2d 53, 66, 133 N. W. 2d 393.

[16] *Stanley v. Illinois, supra,* at page 651.

those able and willing to do so to provide adoptive homes for waifs and foundlings. It goes beyond the trauma to child and adoptive parents of upsetting adoption proceedings after the time for statutory appeal has expired. It goes to the very real danger of predictable blackmail if belated challenges to adoptions are permitted. Some putative fathers, determining somehow the identity of adoptive parents, would show up to suggest the possibility of their challenging the validity of the adoption proceedings. One needs no crystal ball to anticipate that some such fathers would suggest that, for a fee, they might forego such belated challenge. Those who had learned to love and cherish the child they brought into their family circle would be easy prey for those who showed up to claim a fee for their earlier services.

Statutorily prescribed time limits for appeal are to be complied with in all cases. Particularly in cases involving termination of parental rights and adoption proceedings, such time limits on appeals ought to be rigidly adhered to. In the case before us, the petitioner failed to timely appeal the denial of his challenge to the court order terminating his parental rights. He did challenge —by motion to vacate—the validity of the termination of parental rights judgment. A hearing was held, and the petitioner's challenge to the judgment was rejected by order of the county court that had earlier entered the judgment. Under the statute, the petitioner had forty days within which to appeal this adverse county court ruling on his challenge.[17] Instead, he elected to abandon any such appeal. When the time expired for appeal, he lost his only right to successfully attack the termination of his rights by the county court judgment. The plain fact is that he asked for a court ruling on his

---

[17] Sec. 48.47, Stats., providing: "Any person aggrieved by an adjudication of the county court under this chapter and directly affected thereby has the right to appeal to the circuit court of the same county within 40 days of the entry of the order . . . ."

challenge to the termination of rights judgment. He got it. He was then required to appeal such ruling, adverse to his claim, within the statutory time provided for such appeal. When he did not do so, he closed his only avenue of legal appeal.[18] There are many legitimate purposes served by extraordinary writs, but restoring a right to appeal lost by failure to appeal within a statutorily prescribed time limit is not one of them.[19] By failing to appeal within the required period of time, the petitioner not only closed the door—he locked it.

(3) *Welfare of adopted child.*

We are directed by the United States Supreme Court to give "due consideration for . . . the fact that the child has apparently lived with the adoptive family for the intervening period of time." That intervening period of time is now four years. Clearly this portion of the high court remand makes relevant court inquiry into the present well-being and best interests of the child involved. If this were solely a matter of the propriety of earlier legal proceedings, whether the child had been with its adoptive parents for five weeks, five months or five years would make no conceivable difference.

The introduction of the need of court concern as to the welfare of the child involved should come as no jarring note in this state. This court has said, "the polestar remains the welfare of the child."[20] This court, of custody disputes in divorce cases, has observed, ". . . [C]hildren involved in a divorce are always disadvantaged *parties* and . . . the law must take affirmative steps to protect their welfare."[21] (Emphasis supplied.) What

[18] *Bublitz v. Matulis* (1967), 34 Wis. 2d 23, 148 N. W. 2d 64; *United States v. Burczyk* (1972), 54 Wis. 2d 67, 194 N. W. 2d 608.

[19] *State ex rel. Doxtater v. Murphy* (1946), 248 Wis. 593, 602, 22 N. W. 2d 685.

[20] *Welker v. Welker* (1964), 24 Wis. 2d 570, 578, 129 N. W. 2d 134.

[21] *Kritzik v. Kritzik* (1963), 21 Wis. 2d 442, 448, 124 N. W. 2d 581.

the italicized reference meant was made clear when this court subsequently stated that children, in disputes as to their custody, ". . . are not to be buffeted around as mere chattels . . . but rather are to be treated as *interested and affected parties* whose welfare should be the prime concern of the court in its custody determinations." [22] (Emphasis supplied.) What the nation's highest court has made clear is that the child here involved is not to be treated as a pawn in a chess game. He is an interested and affected party whose welfare is to be given consideration by this court in this case.

In this case, following remand from the high court, our court appointed a referee to determine, among other issues, whether the best interests of the child would be served by its custody being awarded to the putative father. The referee, a county judge with years of experience and national stature in the fields of juvenile and family law, found that it would be in the best interests of the child to remain with its adoptive parents. On this record, it is difficult to see how the finding and recommendation could be otherwise. A theologian once suggested, "Give me the child until it is three. . . ." Here the child has spent not three, but four important formative years with its adoptive parents. Aside from the trauma involved in the uprooting, the child's roots are anchored in this only home environment and family setting it has ever known. We see no basis for challenging, and every reason for concurring in, the referee's finding of fact that this child's best interests would best be served by its remaining with its adoptive parents.

Giving due consideration to the three areas of proper court concern, as mandated by the United States Supreme Court, we conclude:

(1) By denying paternity and refusing to assure support for the child, the petitioner equitably estopped him-

---

[22] *Wendland v. Wendland* (1965), 29 Wis. 2d 145, 157, 138 N. W. 2d 185.

self from challenging the termination of parental rights judgment.

(2) By electing not to appeal within statutory time limits the county court order rejecting his challenge to the termination of parental rights judgment, the petitioner abandoned and lost his right to challenge such judgment.

(3) Giving consideration to the four years during which the child has lived with its adoptive parents, it is clear that the best interests and welfare of such child would be served by permitting it to remain with the only parents and in the only home that it has ever known.

For these reasons, the writer, joined by Mr. Justice LEO B. HANLEY and Mr. Justice CONNOR T. HANSEN, would deny the writ requested.