**In re Joseph Ryan RIGGS, a Minor,**

**Robert TERRAZAS, Petitioner-Appellee,**

v.

**Tommy Joe RIGGS and Ann Marie Riggs, Defendants-Appellants.**

Court of Appeals of Tennessee,
Western Section.

July 29, 1980.

Permission to Appeal Denied by Tenn. Supreme Court Oct. 6, 1980.

Petition for Writ of Cert. Denied by U. S. Supreme Court Feb. 23, 1981.

Certiorari Denied Feb. 23, 1981.
See 101 S.Ct. 1370.

James D. Todd, Jackson, and James B. Outman, Tucker, Ga., for defendants-appellants.

George L. Morrison, Jackson, Edwin M. Saginar, Atlanta, Ga., and Nordin F. Blacker, San Jose, Cal., for petitioner-appellee.

SUMMERS, Judge.

This suit was commenced in the Chancery Court of Madison County on July 26, 1977, by Robert Terrazas, the petitioner-appellee. On that date, the appellee filed a petition seeking a writ of *ne exeat* and a petition for writ of habeas corpus against Tommy Joe Riggs and Ann Marie Riggs, the defendants-appellants. Terrazas alleged that he was the natural father of an infant boy, Joseph Ryan Riggs, who had been adopted by the appellants in Georgia. Terrazas further alleged that the appellants were unlawfully detaining the minor child and that he was entitled to the possession and custody of the minor child.

Terrazas prayed that the writ of *ne exeat* be issued to keep the appellants from leaving this jurisdiction until the matter was settled. Terrazas prayed in the writ of habeas corpus that the court grant the custody of the child to him. Both writs were issued the day they were sought.

A hearing was held before the chancellor on August 7, 8, and 9, 1979. His opinion was released on September 21, 1979, finding that Terrazas should be awarded custody of the minor child and that pending further hearings and appeals, the minor child should be placed in the protective custody of the Tennessee Department of Human Services.

The appellants perfected an appeal to this court, which in turn entered a stay order which provided that the minor child remain with the appellants pending the appeal to this court on its merits.

The appellants have presented seven issues for review by this court:

1. Did the Trial Court err in failing to give full faith and credit to the Georgia adoption order?

2. Did the Trial Court err in affording Plaintiff a legal status which was not justified in fact or in law?

3. Did the Trial Court err in conducting a hearing on extraneous matters when the only issue before the Court was the *habeas corpus* question of the legality of the Defendant's holding of the child?

4. Did the Trial Court err in rendering an opinion without affording Defendants an opportunity to file an answer?

5. Did the Trial Court err in rendering an opinion and judgment while Defendants had motions pending which had not been acted upon by the Court?

6. Did the Trial Court err in admitting into evidence certain depositions taken by Plaintiff without Defendants having been given adequate notice of the taking of said depositions?

7. Will the ruling of the Trial Court destroy the institution of adoption?

In the fall of 1977, while he was in his final year of law school at Santa Clara University, Terrazas began dating Roneva Anderson, also a student at Santa Clara University, and they contemplated marriage. In May, 1978, Miss Anderson became pregnant and considered surrendering the child for adoption. However, Terrazas made it known to Miss Anderson on several occasions that he was desirous of taking the child and raising it.

In the fall of 1978, Terrazas was unable to determine the whereabouts of Miss Anderson. After it became clear to Terrazas that Miss Anderson did not want to marry him, he retained legal counsel. On November 29, 1978, he filed a petition under the Uniform Parentage Act of California seeking to establish a parent-child relationship with his unborn child. Numerous efforts were made to serve the mother with legal process in California. She was finally located and served on February 25, 1979. Unbeknownst to Terrazas, a petition for adoption had already been filed in Georgia by Mr. and Mrs. Riggs. Also during this time, Terrazas contacted several adoption agencies in an attempt to prevent the feared adoption of his child.

After breaking off her relationship with Terrazas, Miss Anderson counseled with Father Joseph Ryan, a Catholic priest, who introduced her to a Sister Julianna, resident of a Catholic convent in Reno, Nevada. Arrangements were made for Miss Anderson to live in Reno at the convent until her baby was born.

In December, 1978, Father Ryan telephoned Mr. and Mrs. Riggs in Georgia about the possibility of adopting the child who was soon to be born to Miss Anderson. On December 18, 1978, Mr. and Mrs. Riggs sent a check to Father Ryan for $2,000.00 to cover the perinatal expenses incurred by Miss Anderson. Later Mr. and Mrs. Riggs also paid the plane fare for Sister Julianna to transport the baby from Reno, Nevada, to Georgia.

Early in January, 1979, Terrazas contacted Father Ryan, who refused to reveal Miss Anderson's whereabouts although he was at the time arranging for the adoption of the unborn child. In fact, he told Terrazas he knew nothing about the matter.

Miss Anderson's baby was born on January 29, 1979. Masquerading as Jessica Stewart, she signed a release, surrender and affidavit denying any knowledge of the name and whereabouts of the child's biological father. As Jessica Stewart she also

signed the child's birth certificate. Three days after the child was born, he was delivered to Mr. and Mrs. Riggs in Georgia by Sister Julianna.

On February 7, 1979, Mr. and Mrs. Riggs filed a petition for adoption in the Superior Court of Colquitt County, Georgia. The false affidavits of Miss Anderson, using the assumed name of Jessica Stewart, were attached to the petition. On March 1, 1979, a hearing was held in the Georgia court, and the natural father's rights to the child were terminated. The only evidence before the court on that date as to the father's identity was the false affidavit of the mother. The evidence showed that there was no attempt to verify the identity of the natural father. The Department of Human Resources of Georgia made a visit to the home of the defendants on March 7, 1979. Early in March, that same agency made its only contact with the mother, by telephone, whereupon the mother informed the social worker that she did not know the identity of the father.

Very soon after the parental rights of Terrazas were terminated in Georgia, Mr. Riggs found employment in Tennessee, and on March 17, 1979, signed an agreement to purchase a house in Jackson, Tennessee. The final hearing on the adoption was held in Georgia on April 12, 1979, and on the next day the appellants moved from Georgia to Tennessee.

After Miss Anderson was served with the California suit instigated by Terrazas, she denied having a baby, and a continuance was sought by her attorney for a medical examination. When the matter was finally heard in the California court on April 30, 1979, Terrazas was found to be the father of the minor child. As a result of this finding, the California court issued a restraining order against any, placement of the child for adoption. It was at that hearing that Terrazas was informed that Miss Anderson had given birth to his son in Nevada, listing her name as Jessica Stewart, and that the child had been adopted by Mr. and Mrs. Riggs in Georgia. Terrazas then had the minor child's birth certificate

changed in Nevada to reflect the name of Joseph Robert Terrazas.

Terrazas then retained counsel in Georgia and filed an action to determine whether an adoption had taken place. The action was initially begun in Atlanta, and upon Terrazas' learning that the adoption proceedings had occurred in Colquitt County, Georgia, proceedings were commenced there. After proceedings were commenced in Colquitt County, it was learned that Mr. and Mrs. Riggs had moved to Madison County, Tennessee.

In April of 1979, Mr. and Mrs. Riggs learned of the California suit which had been instituted by Terrazas. Mr. and Mrs. Riggs took no action in this matter until they were served with the papers in this suit, which was commenced in Madison County, Tennessee.

The appellants rely heavily on the Tennessee Supreme Court case of *Abernathy v. Chambers*, 482 S.W.2d 129 (1972), as authority for the principle that the full faith and credit clause requires the Tennessee courts to accord res judicata effect to a final decree rendered by another state. We find, however, that in the *Abernathy* case the Tennessee Supreme Court first looked to the issue of whether the foreign (Mississippi) state court had jurisdiction. Before affording the foreign sister state judgment full faith and credit, the Tennessee Supreme Court determined that all essential parties to the Mississippi proceeding were, in fact, before the Mississippi court. *Abernathy* held that the Tennessee court was at liberty to see if questions of jurisdiction had been fully and fairly litigated, and finally decided, in the court which rendered the original judgment.

In a 1942 case, *McAlhany v. Allen*, 195 Ga. 150, 23 S.E.2d 676, 680 (1942), the Georgia Supreme Court refused to recognize a Tennessee adoption after finding a fatal infirmity in the Tennessee proceedings. In *McAlhany*, the Georgia court said:

> [T]he Full Faith and Credit Clause of the Federal Constitution would not require that such decree of adoption be given effect in this state as against the father,

where he was not made a party in the adoption case, and was not served, and did not appear and plead, or otherwise waive service, or consent to such adoption....

█ We are not persuaded that Tennessee has no choice but to give full faith and credit to the order in Georgia granting adoption unless this court can find that the Georgia judgment was vitiated by a manifest fraud. We agree with the appellants that a final judgment in a sister state is ordinarily conclusive upon the merits in every other state, and we applaud the principle of comity; however, we are not obliged to give full faith and credit to any judgment of a state which we hold to be violative of Tennessee's public policy or the Federal Constitution. *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), *reh. denied* 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 92 (1958). We look here to see if there were such failures of jurisdiction and/or due process of laws in Georgia as to bring us within the rule enunciated by the United States Supreme Court in the landmark case of *Williams v. State of North Carolina,* 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945), or *Hanson, supra.* These are threshold questions. We, therefore, do not need to look into the issue of whether such fraud was perpetrated by the mother on the Georgia court as to vitiate the Georgia judgment.

In *Williams v. State of North Carolina, supra,* the United States Supreme Court stated:

> It is one thing to reopen an issue that has been settled after appropriate opportunity to present their contentions has been afforded to all who had an interest in its adjudication. This applies also to jurisdictional questions. After a contest these cannot be relitigated as between the parties ... But those not parties to a litigation ought not to be foreclosed by the interested actions of others, especially not a State which is concerned with the vindication of its own social policy and has no means, certainly no effective means, to protect that interest against selfish action of those outside its borders ....

*Williams v. State of North Carolina* held that a judgment rendered by a court in one state can be made a judgment in another state only if the court rendering the original judgment had jurisdiction to render it, and that a state decree of divorce may be collaterally impeached in another state for want of jurisdiction even though the record purports to show jurisdiction.

In the instant case the appellee did not have notice of the Georgia proceedings of adoption and was not before that court. The mother of the child, Roneva Anderson, evidently did everything she could to keep the appellee from his child and to deny him an opportunity to be heard in Georgia. She was aided and abetted in this by Father Ryan, a friend of the appellants who had the child delivered to them for adoption.

█ In litigation between parties over private rights, it is well-settled that due process of laws requires that both notice and an opportunity to be heard be given to necessary parties as to the essentials of a judicial proceeding. Notice and opportunity to be heard are the minimal requirements of due process. *Groves et al v. Witherspoon,* 379 F.Supp. 52 (E.D.Tenn., 1974); see also *In Re Adoption of Malpica-Orsini,* 36 N.Y.2d 568, 370 N.Y.S.2d 511, 331 N.E.2d 486 (N.Y., 1975).

█ Let us assume, *arguendo,* that the appellee Terrazas had been married to the birth mother. If so, for this court to give full faith and credit to the Georgia adoption decree, rendered without the Georgia court's having in personam jurisdiction over Mr. Terrazas, would unquestionably deprive the married father of due process of laws. Before the Georgia court could condemn a *married* father to losing his child, that court must afford him an opportunity to contest the propriety of the legal action taken against him. Such is the Constitutional guaranty applied to the states by the Fourteenth Amendment.

But the appellee Terrazas was not married to the birth mother, Roneva Anderson. The appellants call Mr. Terrazas the mere

"sperm impregnator" of the birth mother. The record convinces this court that the appellee was, at the very least, the natural father of the baby whose custody is in question here.

The issue becomes, then, whether the appellee, the natural father, had established such a relationship with his natural minor child as to entitle him to due process of laws—specifically, notice and an opportunity to be heard—before his parental rights, if any, could be terminated by any court. If we find that the appellee had achieved a status entitling him to due process of laws in the Georgia adoption proceeding, then we cannot give full faith and credit to the Georgia decree of adoption. *See In re: Adoption of McElroy*, 522 S.W.2d 345 (Tenn. Ct.App. 1975), *cert. denied* 423 U.S. 1024, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *McAlhany v. Allen, supra; Hanson v. Denckla, supra.*

The appellants argue that the chancellor below erred in affording the appellee a legal status which was not justified in fact or in law. The appellants argue that the putative father was nothing more in Georgia than the male whose sperm had impregnated the mother of Joseph Ryan Riggs, and that this type of putative father was not an essential party in the Georgia adoption proceedings who, as such, had to be served with process.

Implicit in the appellants' argument is the theory that if the appellant is a married father—or possibly an unmarried father who has established a familial relationship with the child—he was entitled, in the Georgia court, to notice comporting with the Due Process of Laws Clause of the Federal Constitution; whereas if the appellee is only an unmarried father—or an unmarried father who has not established a familial relationship with the child—he does not come within the constitutional guaranty. The appellants would have us ignore the reasons why the appellee did not establish familial ties with the minor child.

The appellants' contentions lead us now to *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), a landmark case dealing with the rights of fathers of illegitimate children to notice and an opportunity to be heard; and we note that the marked trend of the law is to favor these rights.

In *Stanley* the United States Supreme Court labeled the right to raise one's children as a basic civil right of man. The *Stanley* court further said "it is cardinal with us that the custody, care and nurture of the child reside first with the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."

Unmarried, Stanley had lived with the mother of his three children, along with the children, for a number of years. When the mother died, the children were declared wards of the state and placed with court-appointed guardians. Under Illinois law, *married fathers* and unwed mothers could not be deprived of their children absent a showing of unfitness. The Illinois Supreme Court said that the actual fitness of Stanley, as an *unwed* father, was irrelevant and that he could be separated from his children upon mere proof that he and the mother had not married. Stanley claimed that he had been deprived of equal protection of the laws guaranteed him by the Fourteenth Amendment. On appeal, the United States Supreme Court concluded that all Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody; therefore, when Stanley was not granted such a hearing, he was denied equal protection under the laws. The *Stanley* court further stated: "To say that the test of equal protection should be the 'legal' rather than the biological relationship is to avoid the issue. For the Equal Protection Clause necessarily limits the authority of a State to draw such 'legal' lines as it chooses." A parent's interest in his or her children must be protected absent a countervailing interest.

In *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), *reh. denied* 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978), the plaintiff attacked the Georgia adoption statutes as being violative of the Equal Protection Clause of the Fourteenth

Amendment because they were discriminatory in treatment of putative fathers. *Quilloin* was to be appealed to the United States Supreme Court solely on the disparate statutory treatment of a married father and an illegitimate father. The appellant was the father of an illegitimate child whose adoption was sought by the mother's husband. The child had been in the custody and care of the mother for his entire life. The appellant tried to block the adoption of the child, but he did not seek custody of his child. *Quilloin* was not a case in which the natural father at any time had, or sought, actual or legal custody of the child. At the hearing at the lower court, the appellant was not found to be an unfit parent, but the adoption was granted over his objections.

Under Georgia law a child born *in wedlock* cannot be adopted without the consent of each living parent if the parent has not voluntarily surrendered the rights to his child or been adjudicated unfit. *Outside wedlock*, only the consent of the mother is required for the adoption of an illegitimate child. If the father legitimates the child, either by marrying the mother and acknowledging the child as his own or by obtaining a court order declaring the child to be legitimate and capable of inheriting from him, he also may veto an adoption of his child.

On appeal to the Supreme Court of Georgia, the *Quilloin* appellant claimed that the applicable Georgia statutes violated the Equal Protection and Due Process clauses of the Fourteenth Amendment and contended that he should have the same rights as a married or divorced parent. The Georgia Supreme Court upheld the lower court, relying on a strong state policy of rearing children in a family setting and on the fact that the appellant had not taken steps to support or legitimate the child over a period of more than 11 years.

The *Quilloin* appellant then appealed to the United States Supreme Court, and his equal protection claim was based solely on the different statutory treatment of unmarried fathers and married fathers. The father did not claim that he was deprived of a right to a hearing nor did he challenge the sufficiency of the notice.

The Georgia court had grounded its decision on the best interest of the child. The United States Supreme Court examined this issue under the Due Process Clause, then under the Equal Protection Clause, and said:

> We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." *Smith v. Organization of Foster Families,* 431 U.S. 816, 862–863, 97 S.Ct. 2094 [2119], 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment). *But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. . . .*
>
> . . . We think appellant's interests are readily distinguishable from those of a separated or divorced father, and accordingly believe that the State could permissibly give appellant less veto authority than it provides to a married father. Although appellant was subject, for the years prior to these proceedings, to essentially the same child support obligation as a married father would have had, compare § 74–202 with § 74–105 and § 30–301, he has never exercised actual or legal custody over his child, and thus has never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child. Appellant does not complain of his exemption from these responsibilities and, indeed, he does not even now seek custody of his child. In contrast, legal custody of children is, of course, a central aspect of the marital relationship, and even a father whose marriage has broken apart will have borne full responsibility for the rearing of his children during the period of the marriage. *Under any standard of review, the State was not foreclosed from*

*recognizing this difference in the extent of commitment to the welfare of the child.*

*For these reasons, we conclude that §§ 74–203 and 74–403(3), as applied in this case, did not deprive appellant of his asserted rights under the Due Process and Equal Protection Clauses. The judgment of the Supreme Court of Georgia is, accordingly, affirmed. Quilloin, supra, at 255, 98 S.Ct. at 555.* (Emphasis added)

In *Quilloin, supra,* the father knew where his child was and could have supported or legitimated his child, but he did not choose to do so. In the case at bar, the father has gone to great lengths to locate and to gain custody of his child. The appellee has sought to exert full responsibility for his child. Although it is true, as the appellants allege, that the putative father and the child here have had a lack of relationship, we find that any lack of relationship is not through the fault of the father. The putative father made obvious efforts to establish a *de facto* and *de jure* relationship with the child.

We look here to the extent of the appellee's commitment to the welfare of his child, and find it considerable. *See In re: Adoption of McElroy, supra.* In an age of permissive sex and fleeting relationships, the appellee's long quest to assume responsibility for his child is impressive indeed.

*Quilloin, supra,* cannot be relied upon as a basis for overturning the chancellor, as the pivotal issue there was not the sufficiency of notice to the unmarried parent under the Georgia statutes. *Quilloin* recognized that an unwed father was entitled to due process safeguards before his parental rights could be terminated. Notice is one of the most basic due process safeguards.

In the instant case, the appellee has established, through his sperm and through his efforts to find his natural child, such a relationship with the child as to entitle him to due process of laws in any proceeding adverse to his parental rights. No court could have constitutionally deprived this father of his child without giving him notice. And when third parties, appellants here,

seek custody of the appellee's child, no court could constitutionally deprive the appellee of his child absent the showing of a strong countervailing interest.

The appellants cite *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), which held unconstitutional, as gender-discriminatory, a part of a New York statute. The New York statute granted an unwed mother the right of absolute veto over a proposed adoption. The same New York statute made the unmarried father's consent irrelevant. This part of the statute was held to be in violation of the Equal Protection Clause of the Fourteenth Amendment. The United States Supreme Court stated that "in these circumstances where the father has never come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the state from withholding from him the privilege of vetoing the adoption of that child." *Ibid,* 99 S.Ct. at p. 1768.

We think that the appellee has come forward to participate in the rearing of his child within the meaning of the *Caban* guidelines. This means that in the Georgia court he should have been allowed the privilege of vetoing his child's adoption. Instead, he received no notice at all of the adoption proceedings.

The appellants contend that we cannot apply the guidelines set out in *Caban* to the case at bar because *Caban* cannot be retroactively applied. We disagree. *Caban* does not overrule clear past precedent on which litigants may have relied, nor does it decide an issue of first impression whose resolution was not clearly foreshadowed. In determining whether *Caban* can be retroactively applied, this court has followed the test of the United States Supreme Court and weighed the merits and demerits in this "case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Chevron Oil Company v. Huson,* 404 U.S. 97, 107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971).

As to this retroactivity issue, we go further and state that we have not found it necessary to fit the appellee within the *Caban* guidelines. We believe that the appellee amply meets the tests of *de facto* fatherhood as set out in *Stanley, supra* and *Quilloin, supra.*

The appellee was entitled to minimal due process of laws before his natural child could be adopted by the appellants. This court will not deprive such a parent of the parent-child relationship, one of the most basic of civil rights, without affording that parent adequate notice and an opportunity to be heard.

■ In the Georgia adoption proceedings under which the appellants claim their rights to the child, the father had no notice and no right of hearing before his parental rights were terminated. There can be no valid adoption without a valid termination of parental rights. *State ex rel. Lewis v. Lutheran Social Services of Wisconsin & Upper Michigan,* 59 Wis.2d 1, 207 N.W.2d 826 (1973). The interest of a father in his child is of profound importance, deserving protection. This state has a strong interest in sustaining the father-child relationship and protecting the family unit.

■ For this court to enforce the Georgia judgment, which is fraught with constitutional difficulties, and to deny the natural father due process of laws, would be repugnant to the Federal Constitution and the public policy of Tennessee. We do not afford full faith and credit to the Georgia decree under which the appellants claim custody of the child, and said decree is hereby rendered nugatory. We hold that the appellee is the birth father, the *de facto* father, and the *de jure* father of the minor child. Because the Georgia adoption decree is invalid, and because of the natural father's parental status, the chancellor below correctly ruled that a writ of habeas corpus would lie in favor of the appellee.

In response to the appellants' contention that sustaining the trial court will destroy the institution of adoption, we must note that *Williams v. State of North Carolina,* *supra,* did not curtail the institution of divorce.

We shall not examine the issues of whether the chancellor below erred in: (1) conducting a hearing on matters extraneous to the habeas corpus proceedings; (2) rendering an opinion without affording the defendants-appellants an opportunity to answer; and/or (3) rendering an opinion while defendants had motions pending. It is enough to hold that the chancellor correctly granted the writ of habeas corpus. The rights of the minor child were fully protected at the habeas corpus proceeding, and the chancellor's decision not to appoint a guardian ad litem was proper and within his sound discretion. *Gann v. Burton,* 511 S.W.2d 244 (Tenn. 1974).

■ The appellants contend that the trial judge erred at the habeas corpus hearing in admitting into evidence the out-of-state deposition of the birth mother, Roneva Anderson. The entire record of the proceeding conducted in Calaveras County, California, which included the deposition of Roneva Anderson and the judgment of that court adjudicating Terrazas to be the father of the minor child, was properly admitted into evidence in the trial court of Madison County, Tennessee, the entire record having been properly authenticated pursuant to Rule 44 of the *Tennessee Rules of Civil Procedure.* Therefore, we must give full faith and credit to the California proceedings establishing Terrazas to be the natural father of the minor child.

For the reasons stated, and under the authorities cited, we respectfully overrule all issues presented by the appellants for our review.

We affirm the chancellor's issuance of the writ of habeas corpus. Custody of the minor child is awarded to the appellee, Robert Terrazas. Pending time for appeal all parties are enjoined from removing the minor child from this jurisdiction.

The birth certificate of the minor child shall be amended in order to reflect the child's new name, as chosen by the appellee.

The costs of this appeal are taxed against the appellants, for which execution may issue if necessary.

MATHERNE and EWELL, JJ., concur.