Stanley Gartenstein, J.
The within proceeding, which raises the constitutionality of article 5 of the Family Court Act, is brought pursuant to subdivision (b) of section 651 of the act as enacted in 1972 and amended in 1973. It seeks visitation only, a proceeding which should be governed by relatively simple concepts but which, for reasons to become apparent, has turned into a nightmare of complexities.
Briefly, the petitioner is the putative unadjudicated father of the infants Johny and Necta. Respondent, now living with another man, is their natural mother. The parties were never married. Petitioner was listed on the birth certificates of both children as their father. Respondent refuses to permit visitation arid raises an interesting threshold issue, a denial of paternity on the part of petitioner and the legal effects thereof. This alleged lack of paternity is raised first as an issue of fact. As a corollary thereof, respondent claims that assuming arguendo a finding of paternity in these proceedings, petitioner should still be nonsuited as being without remedy in this court. This claim is based on an ingenious two-tiered argument. First: visitation, if independent of any prime remedy to which it can be annexed, may only be awarded to a putative father in paternity proceedings under article 5 of the Family Court Act, proceedings which the statute provides, may be commenced only by a natural mother against a putative father and not vice versa. Second: even if custody is awardable in proceedings brought by a putative father against a natural mother (see Matter of Anonymous v Anonymous, 26 NY2d 740) by writ of habeas corpus in the Supreme Court, the enactment and amendment of subdivision (b) of section 651 did not confer the right to commence proceedings seeking solely visitation in this court (citing Matter of Donne v Pace, 74 Misc 2d 127). In point of fact, employing this argument, *582 every case cited by petitioner, including the landmark adjudication in People ex rel. "Francois” v "Ivanova”(14 AD2d 317) can be distinguished by the fact that the orders of visitation there issuing were adjunct to custody as determined by other proceedings. (See Matter of Anonymous v Anonymous, supra; People ex rel. Meredith v Meredith, 272 App Div 79, affd 297 NY 692; People ex rel. Lewisohn v Spear, 174 Misc 178; Matter of Loretta "Z.” v Clinton "A.” 36 AD2d 995.)
Subdivision (b) of section 651 of the Family Court Act:
In 1972, to short-circuit the waste of time, money and effort wherein custody proceedings had to be instituted via habeas corpus writ in Supreme Court only to be referred to this court which had better facilities to deal with them, the amended subdivision (b) of section 651 was enacted (L 1972, ch 535, § 1) reading as follows: "(b) When initiated in the family court, the family court has jurisdiction to determine proceedings brought by petition and order to show cause, for the determination of the custody of minors.”
Thereafter, in 1973, the new statute was further amended (L 1973, ch 916, § 1) to read: "(b) When initiated in the family court, the family court has jurisdiction to determine, with the same powers possessed by the supreme court in addition to its own powers, proceedings brought by petition and order to show cause for the determination of the custody of minors.” (Added words in italics.)
Immediately prior to the 1973 amendment, this court held in Matter of Donne v Pace (74 Misc 2d 127, supra, Jacob Lutsky, J.) that despite the enactment of the 1972 addition to section 651 granting the right to adjudicate custody, said delineation of "custody” did not include visitation which could only be awarded as adjunct to other proceedings in this court. Reviewing sections 447, 461, 466, 467, 651, 652 and 654 of the Family Court Act, which pertain to custody and visitation, the court concluded that had there been a legislative intent to include visitation within the purview of "custody”, said intent would have been clearly expressed. To bolster the argument that visitation must be specifically delineated by the Legislature, the court pointed out the pendency of a bill (S. 1311-A) which would have had that specific effect. This prospective amendment was not enacted into law. In so holding, my brother expressed his respectful disagreement with the holding in Matter of Sturm v Sturm (71 Misc 2d 577), which held *583 that the enactment of subdivision (b) of section 651 had the effect of amending section 447.
In view of the fact that subdivision (b) of section 651 was amended subsequent to the decision in Matter of Donne v Pace (supra), does its new language render that holding academic? To answer this question, it is necessary to compare subdivision (b) of section 651 to the statute vesting jurisdiction in the Supreme Court in habeas corpus proceedings, viz., section 70 of the Domestic Relations Law.
Subdivision (b) of section 651 of the Family Court Act AND SECTION 70 OF THE DOMESTIC RELATIONS LAW COMPARED:
A matching of the traditional custody statute, section 70 of the Domestic Relations Law with subdivision (b) of section 651 of the Family Court Act yields the crucial fact that all else aside, section 70 calls for proceedings brought on by writ of habeas corpus alleging illegal detention while subdivision (b) of section 651 of the Family Court Act, ostensibly granting this court greater powers than those of the Supreme Court, calls for petition and order to show cause. The inescapable fact emerges that this purported grant of greater powers to this court by statutory language is merely rhetoric without substance.
First, to reason in a circle, if the Supreme Court, as a court of general jurisdiction has plenary general jurisdiction, i.e., if, as held in Matter of Seitz v Drogheo (21 NY2d 181) and Kagen v Kagen (21 NY2d 532), it already has every power the Family Court has, and may subsequently acquire, how can the Legislature vest greater power in this court than in the Supreme Court? Logically, if the moment a power vests in this court, it automatically becomes one of the Supreme Court, how far around this circle of logic must we run to realize that it is impossible, by definition, to award greater jurisdiction to this court? Further, if the Supreme Court acts by writ of habeas corpus, the majesty of the procedural remedy itself, with roots back to Magna Carta is sufficient demonstration that a substantive grant of power unaccompanied by the adjective tool necessary to effectuate it is meaningless. Simple consideration of the almost magical aura surrounding habeas corpus proceedings will bear this out. A Judge, for example, failing to sign a writ of habeas corpus is personally penalized (CPLR 7003, subd [c]). Further, the classic response to this writ is the forthwith production of the body itself, a remedy not called for by subdivision (b) of section 651 of the Family Court Act. *584 Finally, a writ of habeas corpus transposes the entire body of CPLR article 70 and its special venue provisions (county of alleged illegal detention as opposed to venue provisions of Family Court Act). We must conclude, of necessity, that inequality still exists between the Supreme Court and Family Court in proceedings of this nature.
Having measured this purportedly "greater” power and found it lacking, we cannot rely on it and are again confronted by the conflict between Donne (74 Misc 2d 127, supra) and Sturm (71 Misc 2d 577, supra). We choose the reasoning of neither inasmuch as both were decided on the issue of visitation following a Supreme Court decree which granted primary relief onto which visitation might or might not have been tacked. Hence the case at bar is distinguishable from both Donne and Sturm.
Article 5 of the Family Court Act: Constitutionality:
We thus return of necessity to a study of article 5 governing paternity proceedings inasmuch as it is this article, if any, (§ 549) which would award any relief to petitioner in the nature of visitation if any is to be forthcoming. Section 549 reads as follows: "(a) If an order of filiation is made or if a paternity agreement or compromise is approved by the court, in the absence of an order of custody or of visitation entered by the supreme court the family court may make an order of custody or of visitation requiring one parent to permit the other to visit the child or children at stated periods.”
It follows logically that in order to avail himself of these provisions, a putative father must first have a paternity proceeding pending against him. Obviously, the respondent mother, wanting no part of the petitioning putative father, has not, and certainly is not inclined to commence this proceeding. This stalemate brings us again to a conflict of authority in this court concerning whether or not a putative father may commence proceedings to adjudicate paternity in his favor under article 5. In Matter of Crane v Battle (62 Misc 2d 137), the Honorable Isidore Levine held in the affirmative, based upon a denial of equal protection to a putative father if this remedy were solely to be available to a natural mother. On the other hand in Matter of Roe v Roe (65 Misc 2d 335), the Honorable I. Leo Glasser rejecting the constitutional argument upon which Matter of Crane v Battle was framed, pointed out that the sole purpose of article 5 was to reimburse the public fisc and traced its origins back to the Elizabethan *585 Poor Laws of 1576. He further pointed out that other remedies exist in favor of a putative father and that there is in fact no constitutional requirement that every remedy available to one class of persons be ipso facto available to all classes similarly situated. Both of those holdings preceded the pronouncements of the United States Supreme Court in three cases giving substantial adjective rights to out-of-wedlock fathers decided almost simultaneously (Stanley v Illinois, 405 US 645; Rothstein v Lutheran Social Servs. of Wis. and Upper Mich., 405 US 1051; Vanderlaan v Vanderlaan, 405 US 1051). A reading of these three holdings would almost certainly mandate that either article 5 be construed to permit paternity proceedings by a putative father to save its constitutionality; or that, reading it according to its literal terms, it be declared unconstitutional as a denial of equal protection based upon an invalid sexual classification. Concerning the first option, it is obviously the function of a court to construe a statute as written and not to legislate judicially what is not there in the original text to save its constitutionality. (See McKinney’s Cons Laws of NY, Book 2, Constitution, § 43: "when, however, the language of a statute clearly requires a certain construction, it must be so construed, though this renders it unconstitutional”.) On the other hand, the refusal to read in language not in the original statute does not mandate or even justify that we, as a court of original jurisdiction, exercise transcendent power over an act of the Legislature to declare it unconstitutional. (See National Psychological Assn. for Psychoanalysis v University of State of N. Y., 18 Misc 2d 722, affd 10 AD2d 688, affd 8 NY2d 197, app dsmd 365 US 298.) We thus find ourselves on the horns of a dilemma mandated as we are to hunt for any reasonable means available to avoid a declaration of unconstitutionality. We find it possible to bypass article 5 completely with a strong caveat that courts cannot continue to find these needles in haystacks to avoid constitutional issues because of traditional judicial restraint.
Implied Powers Contained in subdivision (b) of Section 651:
Is it possible to read in the power to grant visitation as prime rather than auxiliary relief under subdivision (b) of section 651 in view of the fact that the Legislature failed to pass the enabling legislation? To do so, we must consult historical sources in which the common law is rooted.
The reign of Edward I of England ending in 1306, is most *586 noted for the tremendous development of the common law almost to the point of its present complexity. Sir Winston Churchill wrote (History of the English Speaking Peoples, vol 1, p 308): "Edward I was the last great figure in the formative period of English Law. His statutes * * * laid down principles that remained fundamental to the law of property until the mid-nineteenth century.”
In addition to, or as corollary to this growth of the common law during this period, it also appears to have coincided with Edward’s expulsion of the Jews during his reign as a result of a series of foreclosures wherein a significant portion of English land passed into their hands in satisfaction of mercantile debts. (Churchill, supra, pp 289-290.) It is not unreasonable to tentatively postulate (hopefully someone with sufficient credentials to do so will someday undertake a definitive study) that much of the mercantile and legal system developing at that time had at least some significant roots in the already sophisticated legal system carried into England by those who made best use thereof to their own advantage. This hypothesis would explain the origin and/or reference to certain Hebraic and Aramaic Talmudic concepts found in the common law, the origin and/or existence of which is obscure or unknown to most scholars. These Talmudic concepts found in the common law date with specificity to a time many centuries prior to their hypothesized origins in English history.
A few selected examples:
(A) The jury system which as a concept and/or tool of justice was well formulated by the 15th century (Churchill, supra, p 219) was even then, far from the instrument of impartiality known today, and in fact, a juryman, rendering a "wrong” verdict could be tried for perjury. Tracing the jury to its origins, Sir Winston points out (p 217) that it was "the one great contribution of the Franks to the English legal system, for, unknown in this country before the Conquest (1066) the germ of it lies far back in the practice of the Carolingean kings”. This reference ignores not only the historic existence of juries at least 5 centuries prior to the Carolingean kings in Talmudic times but even the logical numerical computation of 23 veniremen (Sanhedrin 2a and b) corresponding to the 23 common-law Grand Jurors, the numerical computation of which has been thought to be obscured by history and/or an arbitrary figure;
(B) The equitable concept of construing a nominal deed of *587 conveyance as a security or equitable interest and not absolutely in accordance with its written terms (see Leviticus 25, 13-16) is directly traceable to the biblical injunction surrounding the jubilee year that all conveyed property revert to its original owner thus leading to the legal doctrine of considering deeds as leases until the jubilee year and assessing a prorated purchase price accordingly;
(C) The practice of exempting an evidence of debt (prosbul) from the operation of the statutory seventh year release, if filed and/or recorded, as origin of the Recording Act, centuries prior to the Domesday Book dating from the Norman Conquest of 1066. (See M. Gittin IV, 3; Shevi’it X 3.)
(D) The concept of incorporeal easements against the will of the record owner of real or personal property in furtherance of the public good. (Tur H.M. 292; 20 Darke Moshe, "The ten conditions of Joshua in dividing land”, Baba Kamma 80B— attributed to by Maimonides, but accuracy of which challenged. See: Horowitz, Spirit of Jewish Law, § 181.)
In this connection, and postulating from internal sources only, the existence and absorption of Talmudic Law into the common law in its most formative stages, it is not unreasonable to assume that the very "Rosetta Stone” of Talmudic exegesis wherein law was derived from text, history, custom and usage via 13 principles of construction, played a major part in the development of classic rules of construction in the common law. These 13 principles enunciated by Rabbi Ishmael in Sifra I are inclusive of any- subsequent refinement and/or adoption in whole or in part thereof by the common law. The very first of them, the Kal v’chomer holds that where a principle of law holds true of a major category, it most certainly applies to every minor category included therein. By applying this principle for which no exact counterpart can be found in the common law, one can reason, even without legislative enactment, that the right to adjudicate and award custody must certainly include the right to independently adjudicate visitation without the pendency of a prime proceeding for custody. By adoption of this reasoning, the passage by the Legislature of S. 1311-A might have clarified the situation, but failing same, certainly cannot be construed as ratification of a principle which would permit litigation for the weightier relief of custody and then deny it for the lesser remedy of visitation.
We thus hold, without disagreeing with Donne (74 Misc 2d *588 127, supra) or Sturm (71 Misc 2d 577, supra), both of which are distinguishable, that this court may entertain and act upon a petition solely seeking visitation pursuant to subdivision (b) of section 651 of the Family Court Act. The availability of this remedy, by this construction, permits the court to avoid, as it is mandated to do, confrontation with the very definite constitutional argument surrounding article 5.
It is a matter of record that the major bar associations have called for a revision of the discriminatory scheme of article 5. We must again repeat our admonition that in these times of changing cultural and sexual mores, carrying with them a huge increase in domestic litigation, the courts cannot avoid coming to grips with this constitutional issue much longer. The Legislature is urged to act.
The petition having properly been brought, a hearing shall commence on a date to be settled by counsel with the clerk of the long hearing part. The trial shall commence with the factual issue of paternity; and, if established, shall progress from there to the children’s best interests as affected by visitation.
The court must also point out that both petitioner and respondent are indigent; that they are both represented by counsel appointed and/or authorized to represent the indigent pro bono; that the thoroughness of the research, clarity of the arguments, and perceptivity to the issues, on both sides, equal to representation available to the very wealthy, gives the court itself pride in membership in the legal fraternity.