Justine Wise Polier, J.
In People ex rel. Meredith v. Meredith (272 App. Div. 79, aifd. 297 N. Y. 692) the appellate court (p. 82) stated that, in regard to a dispute on custody between a mother and the putative father of a child born out of wedlock, “ The proper statement of the rule is that the mother of an illegitimate child is prima facie entitled to its custody and, when she is a proper and suitable person, the court will award its custody to her as against the father or any one else.” The court, however, went on to say that: ‘ ‘ When the question of the custody of children is brought before the court by habeas corpus, it is the duty of the court to look solely to their welfare and decide accordingly. (Matter of Lee, 220 N. Y. 532, 538.) * * * The rule which makes the welfare of the child of predominant importance and the paramount consideration in determining who is entitled to its custody applies to illegitimate, as well as to legitimate, children.” (Italics supplied.)
The trial courts have thus been confronted with two doctrines which at times appear contradictory. To what extent does the doctrine of prima facie entitlement to custody by the natural mother override the duty of the court to evaluate all the evidence and determine what is truly in the best interest of the child. In Matter of Anonymous v. Anonymous (26 N Y 2d 740) the Court of Appeals affirmed without opinion on the opinion of the Appellate Division (32 A D 2d 656) a decision reversing the trial court which had granted custody to a putative father in a habeas corpus proceeding. In his dissent, Judge Scileppi (pp. 745, 746) noted that section 70 of the Domestic Relations Law provides: “‘In all cases there shall be no prima facie right to the custody of the child in either parent, but the court shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness, and make award accordingly.’” Judge Scileppi stated that “there is nothing in the legislative history of the statute to justify drawing of such a distinction ’ ’, namely a distinction between the rights of parents of children born in or out of wedlock. Since there was no majority opinion and the Court of Appeals affirmed on the opinion of the Appellate Division, one must look to the latter opinion for the controlling opinion of the Court of Appeals. *136 In the Appellate Division opinion, the court (p. 657) after citing Meredith v. Meredith (supra) as holding that “ When she is a proper and suitable person, the mother of an illegitimate child is prima facie entitled to custody ”, reversed the trial court, stating that the 1‘ Trial Justice made no finding that the mother had ever neglected the infant and made no finding that appellant was an unfit custodian. ’ ’
It would thus seem that at this time the appellate courts do not hold that the best interests of a child, as required by section 70 of the Domestic Relations Law, shall be the sole consideration where the custody of a child born out of wedlock is in issue in a habeas corpus proceeding. In practice the appellate courts have reversed decisions based on such findings absent the additional finding that the mother is unfit. In Matter of Loretta “ Z ” v. Clinton “A ” (36 A D 2d 995), the appellate court again reversed a Family Court decision giving custody to the putative father. In doing so, while recognizing that section 70 of the Domestic Relations Law gave no prima facie right to custody of a child to either parent, the court held that the mother of a child born out of wedlock was prima facie entitled to custody if she was a proper and suitable person, particularly if the child was of tender years. Section 70 was interpreted as granting “preferential consideration” to a fit mother of a child born out of wedlock, while placing primary responsibility on the trial court to look at the child’s welfare. Again the appellate court placed emphasis on the absence of a finding by the trial court that either parent was “ unfit ”.
In a thoughtful and closely reasoned decision by Judge Slifkis, he granted custody of two children born out of wedlock to the putative father, stating that, from the evidence, ‘ ‘ the court might justifiably determine that by reason of temperament and behavior the natural mother in this case may be deemed not to be a proper person to have custody of these children ” (Matter of Godinez v. Russo, 49 Misc 2d 66, 67). Significantly the court then raised what has continued to be a serious problem for trial courts in cases involving custody contests where children are born out of wedlock (p. 68). “It further appears to the court, however, that the distinction between legitimate and illegitimate children insofar as the latter, in matters of custody, carries with it the presumption of custody in favor of the natural mother, should be reconsidered and abolished in the Family Court. It is submitted that the proper standard is that which is enumerated in section 70 of the Domestic Relations Law hereinabove quoted regardless of the manner of birth of *137 the child involved. This court should be granted the same privileges and poAvers in determining the custody of a child born out of wedlock as between the putative father and the natural mother as exist in the case of legitimate children. The harsh view of the common law that a natural child is nobody’s child no longer prevails. To continue the presumption of custody in favor of the natural mother is in a sense a continuation of a stigma which attaches to an illegitimate child. This is patently unfair both to the child and to the Family Court. The Family Court should have the poAver, both as to the illegitimate as well as the legitimate child, only the duty to seek a determination required for the welfare and best interest of the child.”
In the instant case, the habeas corpus proceeding brought by the natural mother against the putative father for the return of custody of a 12-year-old daughter was referred by the Supreme Court to the Family Court for all purposes, by consent of the parties.
Trial of this case has required review of the life history of the child Avith both natural parents, a period when the mother left the child, a brief period when the child was taken to the home of the maternal grandmother in another State against her will, and her voluntary return to the home of her paternal relatives by the father with whom she has now resided for over a year. K is the child of two parents who have lived together for 14 years and for most of the child’s life without the benefit of a ceremonial marriage. The ongoing relationship between the parents and the development of a significant, loving relationship between the father and the child is far different from that of the relationship between a child and putative father as envisaged in the past, Avhen putative fathers were generally assumed to be birds of passage in the lives of children born out-of-wedlock.
The mother, now 38 years of age, has had two daughters out-of-wedlock by two fathers. The older daughter, now 18, has been brought up by a maternal grandmother in another State for the past 14 years with only occasional visits by the mother. The second daughter, who is the subject of this petition, had lived with both her parents, except for some brief separations, until the mother left the home in 1969 leaving her with the natural father for a period of approximately 11 months. While the mother alleged that she left the home due to abuse by the father, she acknowledged she went to live with another man at that time. The mother’s -claim that she visited the child with regularity during the daytime is gainsaid by both the child and *138 the father. This court is satisfied that the mother failed to provide care or supervision of this child, left full responsibility for her care to the father during this period, and in fact abandoned the child.
The mother’s actions throughout this period are inconsistent with her current allegations that the father is not a fit person to care for the child, and this court is satisfied that the serious charges now made against him are either figments of her imagination or weapons devised to force the child’s removal from the home in which she resides with her father and the family of her paternal uncle. There is no credible evidence to sustain the mother’s charges of improper conduct by the father with the child.
The record establishes that after leaving the child with the father for approximately 11 months, the mother appeared at the child’s school and ordered the child to go with her to the home of the maternal grandmother in another 'State where the older half-sister resided. When the child objected, the mother slapped her and forced her to leave. Within two hours after arrival at the home of the maternal grandmother, the mother departed with her man friend, who had accompanied them from New York, leaving the child behind. The mother failed to visit during the following months. When the father located the child and visited her, she expressed unhappiness and he then took her back to New York to live with him in the home of his married brother. The mother now seeks custody, but acknowledged at the initial hearing that it was with a view to having the child live with the maternal grandmother in another State.
The child has been seen in chambers and has testified in this court that she wishes to live with her father in the home of the paternal uncle, his wife and their two sons, 11 and 13 years of age. She is an intelligent, articulate girl now doing well in school. She has. described the excessive drinking of her mother when they lived together, and her unhappiness when subjected to visits with the mother and the mother’s current male friend. Despite her objections to this man, the mother continued to have him and the children of his marriage present during the child’s visits to the mother. The child complained that her mother struck her when she asked questions, and told her to cook for herself when she visited. She expressed dislike for her mother and agreed to visits with the mother only if forced to do so. After a trial period of visitation with the mother regulated by this court pending a decision, the evidence established that the visits proved so unsatisfactory and were so disturbing to the *139 child that they were suspended without prejudice pending the completion of this action.
Psychiatric study of the mother noted that the mother did not have much desire to personally care for the child and would repeat what she had done with the older daughter by leaving her with the maternal grandmother in another State. The father was found to be more personally involved with the child and the more responsible parent. The psychiatrist who saw the child found her to be intelligent, co-operative and able to establish meaningful relationships. To the doctor, as to the court, the child expressed the feeling that all would be well if she were permitted to live with her father. She again expressed her distaste for her mother and her unhappiness due to the mother’s constant alcoholism.
The record in this case clearly establishes that the best interest and, indeed, the welfare of the child require that custody shall remain with the father so that he can provide a stable home for her. This the mother has failed to do. This court is satisfied that she is both unable and unwilling to do so.
In this case, the record is such that apart from the question of the best interest of the child, this court finds that the weight of the evidence establishes that the mother deserted the child for a substantial period of time when she first became involved with her present man friend, that she has had a serious drinking problem, and that she is not “ fit ” by reason of temperament and behavior to provide proper care or a healthy home environment for this child. The requirements as established by the appellate courts, in regard to custody conflicts between a natural mother and a father where there is no ceremonial marriage, are sustained by the evidence in this case.
On the question of visitation, the trial visits during the period of litigation have shown that visits to the mother’s home have proven to be sources of deep unhappiness and disturbance for the child. However, despite the mother’s past failures, this court believes that the way should be kept open for the building of a better mother-child relationship in the future. Visitation will therefore be allowed with the condition that the mother is not to take the child to her home or in the presence of the man friend or his children. Such visits will be limited to the first and third ¡Sundays of each month from 1:00 to 7:00 p.m., the mother to call for and return the child to the home of the paternal uncle, such limitations to continue until such time as the child requests more visitation.
*140 The writ is dismissed, with visitation, as defined above, to the mother.
On the question of counsel fee, counsel for the petitioner requests $2,500 for services in this court and in the Supreme Court less- $650 already paid to counsel by the petitioner. Counsel is correct in stating that the proceeding in this case has been lengthy and time-consuming. In considering what fee should be fixed as the responsibility of the respondent father, this court must consider the financial circumstances of both parties and their respective responsibilities as well as the services of counsel. Under the law both parents are responsible for the support of a child born out of wedlock in accordance with their respective means. In this case the petitioner, although employed, has not contributed to the support of the child since 1969 and the respondent has provided and will continue to provide full support for the child. Both parents are employed, the mother earning $126 weekly before taxes and the father $180 weekly before taxes. The respondent, like the petitioner, was required to engage counsel to represent him in this proceeding.
In the light of these facts, justice and discretion permit only that a modest fee be imposed as the responsibility of the respondent and require that counsel seek any additional compensation from the petitioner. Fee of $500 is fixed to be paid at the rate of $100 monthly to petitioner’s counsel beginning December 1, 1971.