Ramon Martin FIALLO, an infant by his
mother, Celia Francisca Michael Rod-
riguez, et al., Plaintiffs,

v.

Edward H. LEVI, Individually and as At-
torney General of the United States,
et al., Defendants.

No. 74 C 1083.

United States District Court,
E. D. New York.

Nov. 28, 1975.

Janet Calvo, New York City (Kalman Finkel, Morton B. Dicker, John E. Kirklin, Anita Fisher Barrett, New York City, The Legal Aid Society), for plaintiffs.

Douglas J. Kramer, Asst. U. S. Atty., Brooklyn, New York (David G. Trager, U. S. Atty., E. D. N. Y.), for defendants.

## OPINION AND ORDER

Before MOORE, Circuit Judge, WEINSTEIN and BRAMWELL, District Judges.

MOORE, Circuit Judge:

This is an action challenging the constitutionality of two classifications of aliens established by Congress as part of a comprehensive scheme for the admission of aliens into the United States contained in the Immigration and Nationality Act (the "Act"), Title 8 U.S.C. § 1101 *et seq.* Plaintiffs specifically challenge the Act's definition of "parent" and "child" insofar as it excludes the relationship between unwed, biological fathers and their illegitimate children.[1]

---

1. The relevant section is 1101(b)(1), (2), which reads:

(1) The term "child" means an unmarried person under twenty-one years of age who is

(A) a legitimate child; or

(B) a stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred; or

(C) a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation.

(D) an illegitimate child, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother;

(E) a child adopted while under the age of fourteen years if the child has thereafter been in the legal custody of, and has resided with, the adopting parent or parents for at least two years: *Provided,* That no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter.

(F) a child, under the age of fourteen at the time a petition is filed in his behalf to accord a classification as an immediate

The effect of the exclusion is to subject the aliens in question to restrictive numerical quotas and labor certification requirements which are waived for individuals who qualify as parents or children, within the meaning of the Act, of American citizens and permanent residents.[2] Plaintiffs are three sets of unwed, biological fathers and their illegitimate offspring. Both the aliens excluded by this section of the Act and the American citizens or permanent residents who are these aliens' illegitimate children or biological fathers have joined as plaintiffs in this suit; their claim is that the statutory classification is unconstitutional. on its face since unwed biological fathers are excluded while unwed biological mothers are not.

A three-judge court was ordered convened, and plaintiffs have moved this Court for certification as a class action, summary judgment and a permanent injunction. For the reasons which follow, those motions are denied, and judgment is entered for the defendant. The facts are not in dispute, and may be summarized briefly.

Ramon Fiallo, an infant and an American citizen by birth, applied—through application submitted on his behalf by his mother—to the United States Consul in the Dominican Republic to have his alien father officially declared to be his parent under the immigration laws, so that the latter might remain permanently in the United States. Ramon Fiallo's petition was rejected, the Consul stating that Fiallo senior could not be declared the parent of an American citizen since his child was illegitimate. At present, both parents are living together in this country with their child; although the father could qualify as a parent if he legitimated his son, he and the boy's mother do not wish to marry.

Cleophus Warner, a naturalized American citizen, attempted to have his illegitimate son Serge, a citizen of the French West Indies, officially declared to be his child within the meaning of the Act by filing a petition with immigration authorities in New York, so that the boy might remain permanently with his father in this country. The petition was rejected since the boy was neither the father's legitimate nor legitimated offspring, and hence he could not meet the Act's definition of a child.

Trevor and Arthur Wilson are two brothers under twenty-one years of age who are permanent residents of the United States. After the death of their biological mother they sought to have their father, a citizen of Jamaica, officially classified as their parent so that he might qualify for permanent residency in this country. It is not clear whether their petition has already been denied, but denial is certain since the boys were never legitimated and hence their father cannot qualify as a parent under the Act.

The alien fathers and son in this action believe that their only realistic avenue of admittance to this country on a

relative under section 1151(b) of this title, who is an orphan because of the death or disappearance of, abandonment or desertion by, or separation or loss from, both parents, or for whom the sole or surviving parent is incapable of providing the proper care which will be provided the child if admitted to the United States and who has in writing irrevocably released the child for emigration and adoption; who has been adopted abroad by a United States citizen and his spouse who personally saw and observed the child prior to or during the adoption proceedings; or who is coming to the United States for adoption by a United States citizen and spouse who have complied with the preadoption requirements, if any, of the child's proposed residence: *Provided,* That no natural parent or prior adoptive parent of any such child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter.

(2) The terms "parent", "father", or "mother" mean a parent, father, or mother only where the relationship exists by reason of any of the circumstances set forth in subdivision (1) of this subsection.

2. 8 U.S.C. § 1151(b), 8 U.S.C. § 1182(a)(14).

permanent basis is through classification as the parent or child of an American citizen or permanent resident. Fiallo senior has sought a labor certificate unsuccessfully in the past; Wilson senior alleges that the only job for which he is qualified—that of general handyman—is one for which the required certificate is not granted.

Subject matter jurisdiction is conferred on this Court by section 279 of the Act, Title 8 U.S.C. § 1329.

■ A threshold question is presented with regard to Fiallo's standing to maintain this action. The administrative decision on which Fiallo bases this suit is the denial of his petition by the United States Consul at Santo Domingo. Decisions of consuls granting or denying a visa have been held to be immune from judicial review. *See, e. g., Loza-Bedoya v. INS*, 410 F.2d 343 (9th Cir. 1969). We note, however, that the petition in question here did not constitute an application for a visa, but was a preliminary declaration of immigrant status. We will not extend consular nonreviewability, insofar as that rule has been recognized, beyond the actual grant or denial of a visa. This is predicated upon our reluctance to insulate entirely the actions of any public official from judicial scrutiny, and thereby foreclose a group of plaintiffs from seeking relief in the courts. Plaintiff Fiallo, therefore, is not barred from bringing this action.

■■ Turning to the merits, we begin with the proposition that Congress' power to make rules for the admission and expulsion of aliens is exceptionally broad.

The Court without exception has sustained Congress' plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden. [O]ver no conceivable subject is the legislative power . . . more complete than it is over the admission of aliens.

*Kleindienst v. Mandel*, 408 U.S. 753, 766; 92 S.Ct. 2576, 2583, 33 L.Ed.2d 633 (1972) (quotation marks and citations omitted)

The limits to the exercise of this power are few, for an alien has no constitutional right to enter or remain in this country, *Kleindienst v. Mandel, supra.* Moreover, he may be denied entrance on grounds which would be constitutionally suspect or impermissible in the context of domestic policy, namely, race,[3] physical condition,[4] political beliefs,[5] sexual proclivities,[6] age,[7] and national origin.[8]

■■ In regulating the admission of aliens who are the spouses, parents, and children of American citizens and permanent residents, Congress has chosen to specify the kind of relationships which are, for purposes of the immigration laws, embraced within those terms. This is a perfectly proper exercise of the Congressional responsibility to admit into this country those individuals who will be desirable additions to our populace. This includes individuals who will respect our system of government[9] and who will be useful additions to our labor force,[10] as well as those whose lives reflect personal standards of conduct important to our society's sense of morality. And while the Congress' view about what kind of marital or parental rela-

---

3. *Dunn v. INS*, 499 F.2d 856, 858 (9th Cir. 1974).

4. *U. S. v. Esperdy*, 277 F.2d 537, 539 (2d Cir. 1960).

5. *Kleindienst v. Mandel, supra.*

6. *Boutilier v. INS*, 387 U.S 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967).

7. *Nazareno v. Attorney General of United States,* 512 F.2d 936 (D.C. Cir. 1975).

8. *Faustino v. INS,* 432 F.2d 429, 431 (2d Cir. 1970), *cert. denied,* 401 U.S. 921, 91 S. Ct. 909, 27 L.Ed.2d 824 (1971) ; *Hitai v. INS,* 343 F.2d 466, 467 (2d Cir. 1965), *cert. denied,* 382 U.S. 816, 86 S.Ct. 36, 15 L.Ed.2d 63 (1965).

9. *Kliendeinst v. Mandel, supra.*

10. *See, e. g., Buckley v. Gibney,* 332 F.Supp. 790 (S.D.N.Y.1971).

tion should be encouraged in this country may differ from the individual views held by the members of the courts, it is not for the judiciary to usurp the legislative function and replace the Congressional standards with its own.

A number of courts have ruled on the question of whether, in the immigration field, Congress may constitutionally apply its own standards with respect to the status of familial relations, and we note that this power has consistently been upheld. In *United States v. Diogo*, 320 F.2d 898 (2d Cir. 1963), this Court held that a marriage valid under state law need not be recognized as valid under the immigration laws.

Of course Congress may adopt a federal standard of *bona fides* for the limited purpose of denying immigration priorities to persons whose marriages do not meet that standard. That standard, embodied in the Congressional understanding of the terms "marriage" or "spouse" as those terms appear in the immigration statutes is, of course, the relevant standard to apply in exclusion or deportation proceedings brought under the statutory provisions appropriate. 320 F.2d at 905.

In *Faustino v. INS*, 432 F.2d 429 (2d Cir. 1970), *cert. denied*, 401 U.S. 921, 91 S.Ct. 909, 27 L.Ed.2d 824 (1971), we held that it was not unconstitutional for Congress to permit citizen children over the age of twenty-one to bring their alien parents into this country without regard to numerical quotas, but to deny that same privilege to citizen children under that age. Accord, *Perdido v. INS*, 420 F.2d 1179 (5th Cir. 1969). And in an analogous situation the District of Columbia Circuit upheld the application of one aspect of the Act's restrictive definition of child to the provision of the Act granting priority status to the sons and daughters of American citizens; [11] the effect of the holding was to deny the status of child, and hence the consequent statutory benefits, to aliens who were adopted by American citizens after their fourteenth birthdays.[12] *Nazareno v. Attorney General of United States, supra.*

There is no doubt that Congress can establish classifications which result in the granting of benefits to one group of individuals, and their denial to another. Unless the immigration laws in question are wholly devoid of any conceivable rational purpose,[13] or are fundamentally aimed at achieving a goal unrelated to the regulation of immigration,[14] they are not unconstitutional encroachments on the right to equal protection of the laws.

At the request of the Court the Legal Aid Society representing the plaintiffs submitted a most able and exhaustive post-trial memorandum demonstrating via statistical tables and many treatises

11. 8 U.S.C. § 1153(a)(1).

12. This is one of the several types of individuals whom we might commonly call children, but who are excluded from the Act's definition of that term. Others excluded are married children, children over twenty-one years of age, stepchildren who were over eighteen when the marriage creating their status occurred, children who were legitimated after they were eighteen. Similarly, the mothers and fathers of these individuals are not accorded the status of parents within the meaning of the Act.

13. This Court has held that there is no need to apply the test of compelling state interest in immigration cases, since alienage is not a suspect classification for purposes of legisla-

tion regulating the admission and expulsion of aliens. *Noel v. Chapman*, 508 F.2d 1023, 1028 (2d Cir. 1975).

14. In this regard we note that where the Congressional purpose of any law regarding aliens is not to regulate immigration but to invidiously discriminate against American citizens, permanent residents, or already-admitted aliens, that law cannot—in contrast to the one under consideration here—withstand constitutional scrutiny. *See Mow Sun Wong v. Hampton*, 500 F.2d 1031, 1036 (9th Cir. 1974); *Ramos v. United States Civil Service Commission*, 376 F.Supp. 361, 366 (D.Puerto Rico 1974); *cf. Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 91 L. Ed.2d 534 (1971).

its thesis that the "courts are giving increasing legal recognition to the reality that unwed fathers, like mothers, have close ties to their illegitimate children." (Post-Argument Memorandum, p. 17). From these statistics and extensive bibliography counsel draw the conclusion that "the evidence leaves no rational underpinning for discriminatory treatment of unwed natural fathers and their illegitimate children, and leaves no doubt of the patent unconstitutionality of the severe and extreme form of discrimination effectuated by the statutory provisions challenged herein." (Id. p. 21). These conclusions, plaintiffs say (Id. p. 1), demonstrate "the utter irrationality of the unwarranted conclusive presumptions effectuated by the challenged provisions . . ."

■ However, in view of the need to establish administrative procedures abroad which can process immigration applications efficiently, avoid extremely difficult problems of investigation and proof, and minimize the potential for sham claims, we cannot say that the legislative decision to exclude unwed, biological fathers and their illegitimate children from the statutory definitions of parent and child is patently unreasonable. Cf. Faustino v. INS, supra. For example, while the names of biological mothers routinely appear on such documents as birth certificates, this may not be the case where unmarried fathers have not acknowledged paternity officially at about the time of birth. Although such evidence would not necessarily be conclusive of one's status as a parent, nevertheless we perceive that it might be more difficult for an unrelated adult to pose as a child's mother than a child's father, where the birth certificate contains a definite name and identification of the mother only.

As a matter of law, therefore, the challenged immigration provisions are not so arbitrary or capricious as to be unconstitutional; accordingly, we conclude that plaintiffs' provocative statistics and ably documented argument, which certainly would merit Congress' attention, cannot be given weight here, lest this Court engage in the kind of policy-making activity which is properly the province of the legislative branch and not the judiciary.

Plaintiffs urge that Congress' primary purpose in exempting the parents and children of American citizens and permanent residents from quota limitations and labor certification requirements was to enable families to be together in the United States. Without question, the policy behind the statutory enactments was a benevolent one; however, we cannot accept plaintiffs' unspoken assumption that they, and not Congress, should determine who constitutes the "family" which shall be allowed to enter this country on a priority basis. The statutory language is quite clear in its exclusion of unwed fathers and their illegitimate children; the fact that Congress focused upon the type of family which it determined should have the right to emigrate en masse to our shores [15] indicates that it may well have decided that, on balance, unwed fathers would not have such relations with their illegitimate children as would justify their being given this special exemption from the normal immigration requirements which apply to all other individuals seeking visas for permanent residency.

■ Even if it be assumed arguendo that biological, unwed fathers should under all circumstances be accorded the rights of parents, plaintiffs' constitutional claim cannot prevail. The possi-

15. Counsel for the Government persuasively suggested at oral argument that plaintiffs' position could have sobering consequences if adopted by immigration officials: an unwed mother living here could bring to the United States all of her illegitimate children, each of whom could bring over his or her biological father; each father could then bring over all of the children he has ever fathered, and thereafter each of those children could bring over his or her mother, who could then bring over all of her illegitimate children, etc., etc., etc.

bility of joining one's closest family in the United States is a privilege granted by statute, not a right given by the Constitution.

There can be no doubt but that [the appellants] as unadmitted and non-resident aliens have no constitutional right to enter and remain in this country. See *Galvan v. Press, supra,* 347 U.S. at 503–532, 74 S.Ct. 737. It is equally clear that their wives as resident aliens have no constitutional right to keep them here on the theory that the integrity of the family is protected by equal protection principles. *Noel v. Chapman,* 508 F.2d 1023, 1027 (2d Cir. 1975).

The same rule has been applied by this Court when the individual seeking to challenge an alien's expulsion was the alien's United States citizen-child. *Enciso-Cardozo v. INS,* 504 F.2d 1252, 1253 (2d Cir. 1974); *cf. Faustino v. INS, supra.* As we recognized in *Noel v. Chapman, supra* at 1027–8, the burden of separation from one's kin which occurs when an alien relative is properly excludable under our immigration laws and the American citizen or resident determines not to leave this country in order to be with the alien, is not the equivalent of the statutory destruction of the marriage or family relationship. Certainly a difficult choice is involved, but it is not one which is forbidden by the Constitution.

Plaintiffs' final argument is that the operation of the Act's definition of parent and child works a constitutionally impermissible hardship on them. While we are not unmindful of plaintiffs' plight, we have held in the past that such incidental impact on the family as the operation of the immigration laws may have is not violative of the Constitution. *Noel v. Chapman, supra; Enciso-Cardozo v. INS, supra; accord, Robles v. INS,* 485 F.2d 100 (10th Cir. 1973); *Silverman v. Rogers,* 437 F.2d 102 (1st Cir. 1970); *Perdido v. INS,* 420 F.2d 1179 (5th Cir. 1969). The law is at times painful to some, but it cannot

on that basis alone be automatically invalidated as to all.

Consideration of the class action issue is unnecessary in the light of our decision.

WEINSTEIN, District Judge (dissenting):

## I. *Issues*

The constitutionality of the definitions of "parent" and "child" in the Immigration and Naturalization Laws is challenged. Section 101(b)(1) and (2) of the Immigration and Nationality Act (Act), Title 8 U.S.C. § 1101(b)(1) and (2) (1970). Unlike mothers and their illegitimate children, fathers, and their illegitimate children, are excluded from the definition of "parent" and "child". They are therefore ineligible for certain exemptions given citizens' relatives who are trying to enter the country: citizen fathers can not have their migrating illegitimate children exempted from numerical quotas and labor certification requirements as their "immediate relatives"; citizen and permanent resident illegitimate children can not have their migrating fathers exempted from the labor certification requirement. Insofar as pertinent, the definitional provision reads:

"(1) The term 'child' means an unmarried person under twenty-one years of age who is—

(A) a legitimate child; or

\*    \*    \*    \*    \*    \*

(D) an illegitimate child, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother;

\*    \*    \*    \*    \*    \*

"(2) The terms 'parent', 'father', or 'mother' mean a parent, father, or mother only where the relationship exists by reason of any of the circumstances set forth in subdivision (1) of this subsection."

8 U.S.C. § 1101(b) (1970).

The questions presented are (1) whether a statute making it more difficult for a parent and his child—one of whom is a citizen or permanent resident—to live together in this country solely because of the sex of the parent and the illegitimacy of the child is valid under the Fifth Amendment; and (2) whether a federal court is without power to declare such a statute invalid because it is a part of the immigration laws. The answers should be no. The Constitutional road to equality of the sexes is open to men as well as women. Each of these plaintiffs is being deprived of a critical part of his "life . . . without due process of law." U.S.Const. Fifth Amend.; cf. id. Fourteenth Amend. ("equal protection of the laws").

Legal discrimination between men and women or legitimates and illegitimates with no rational basis is no longer tolerated. Where, as here, statutory invidious discrimination punishes American citizens by denying them familial association, one of the most precious attributes of humanity, the courts should say what is plain: the statute is unconstitutional. The wrong to parent and to child is not reduced by characterizing the one as a "biological father", without regard for his progeny. Such disdain for filial affection is incompatible with a Constitution embodying the highest ideals of a civilized nation such as ours.

## II. Facts

### Plaintiffs Ramon Fiallo and Ramon Fiallo-Sone, son and father

Ramon Fiallo is a United States citizen, born in New York City in 1971. Although his father, Mr. Fiallo-Sone, was not married to his mother, his father's name appears on his birth certificate and his father has nurtured him since his birth. An American consul has informed Mr. Fiallo-Sone that he is not eligible for an immigrant visa or permanent residence status without a labor certificate, and that while the labor certificate requirement is waived in the case of fathers of citizen children, the waiver is only available if the child is legitimate issue. A foreign mother of an illegitimate citizen would have obtained the waiver.

### Plaintiffs Serge Warner and Cleophus Warner, son and father

Cleophus Warner, a naturalized citizen, is the unwed father of Serge Warner, who was born in the French West Indies in 1960. Mr. Warner's name appears on Serge's birth certificate, he registered as Serge's father shortly after Serge's birth, and he has acknowledged paternity. Mr. Warner has supported his son since the child's birth. In 1969 Serge, in accord with his parents' and his own desires, entered the United States to live with his father. Father and son took steps to obtain an immigrant visa and permanent residence status for Serge in 1972. The Immigration and Naturalization laws allow citizen parents to bring alien children into the United States as "immediate relatives" without regard to the applicable numerical limitation on immigrants. Mr. Warner's petition was denied on the ground that Serge was not his legitimate issue as required by statute. Had the petition been by a mother who was a naturalized citizen, or had the child been legitimate, the petition would have been granted.

### Plaintiffs Trevor and Earl Wilson and Arthur Wilson, sons and father

Trevor and Earl Wilson, who are now permanent residents of the United States, were born in Jamaica in 1957 and 1959 respectively. Arthur Wilson acknowledges the boys as his illegitimate sons. He lived with them and supported them until 1968, at which time they moved to New York City with their mother. From 1968 until 1974 Mr. Wilson maintained his relationship with his sons by visits and correspondence. He also continued to support them financially. After their mother died in 1974, the two boys asked their father to come to the United States to live with them.

170

But Mr. Wilson was only able to stay for as long as an emergency visa allowed. Since his children are illegitimate, Mr. Wilson is unable to settle in the country without a labor certification. Were a mother in Mr. Wilson's position, or were the children legitimate, the parent would have been able to enter the country without a labor certification.

### III. *Law*

The position of these three families illustrates the severe effects on American citizens and permanent residents from the Act's discrimination between male and female parents and between legitimate and illegitimate children in its definitions of parent and child. The government does not contend that the relationship of parent to child does not exist or that a strong emotional bond between the father and child is lacking in any of these cases. Its position is that the statute compels the discrimination.

This statute, defendant insists, is not subject to judicial review. Characterizing the classification as one of aliens for the purpose of their exclusion from the country, it contends that Congressional power to exclude aliens is unfettered. *See, e. g., Chae Chan Ping v. United States*, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889); *Faustino v. Immigration and Naturalization Service*, 432 F.2d 429, 431 (2d Cir. 1970) (Per Curiam), *cert. denied*, 401 U.S. 921, 91 S.Ct. 909, 27 L.Ed.2d 824 (1971).

But this is not a simple case of classifying aliens for the purpose of preferring some over others for entry. Rather, Congress has hinged immigrants' access to this country on their relationship to citizens and permanent residents. The question thus becomes whether a Congressional classification of citizens and permanent residents which severely disadvantages them may escape traditional constitutional scrutiny merely because it is set in alienage legislation.

If the classification were based on race, rather than gender or legitimacy,

the court's power would be no different. Were Blacks, for example, excluded from the list of those American citizens who could bring in their relatives without regard to quotas, no court would let the statute stand. The Constitution, and in particular, the Fifth Amendment, protects citizens from abusive or discriminatory government action. Packaging a discriminatory classification of citizens in alienage legislation can not insulate it from judicial scrutiny.

There is ample Supreme Court precedent for intervention when enforcement of the Act burdens citizens' Constitutional rights. *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 n. 5, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). *See also, Burrafato v. United States Dept. of State*, 523 F.2d 554 (2d Cir. 1975) (dicta). The Court has recognized procedural due process and Fourth Amendment limitations on the government's exclusion and expulsion of aliens. *See, e. g., Wong Yang Sung v. McGrath*, 339 U.S. 33, 49–50, 70 S.Ct. 445, 454, 94 L.Ed. 616 (1950); *Kwock Jan Fat v. White*, 253 U.S. 454, 459, 464, 40 S.Ct. 566, 568, 570, 64 L.Ed. 1010 (1920); *Kaoru Yamataya v. Fisher*, 189 U.S. 86, 100, 23 S.Ct. 611, 614, 47 L.Ed. 721 (1903); *cf. Lennon v. INS*, 527 F.2d 187 (2d Cir. 1975).

When courts have been faced with challenges to other sections of the Act which classify aliens in terms of their relationship to citizens, they have not shrunk from traditional equal protection analysis. *See Perdido v. Immigration and Naturalization Service*, 420 F.2d 1179, 1181 (5th Cir. 1969); *Faustino v. Immigration & Naturalization Service*, 302 F.Supp. 212, 215 (S.D.N.Y.1969), *aff'd*, 432 F.2d 429 (2d Cir. 1970), *cert. denied*, 401 U.S. 921, 91 S.Ct. 909, 27 L.Ed.2d 824 (1971). *Cf. Noel v. Chapman*, 508 F.2d 1023, 1026–9 (2d Cir. 1975).

So blatant a discrimination on the basis of gender and legitimacy is seldom

found in modern statutes. Illegitimacy as a basis for denial of rights available to legitimates has been repeatedly struck down as invidious and lacking in rational basis. *See, e. g., Jimenez v. Weinberger,* 417 U.S. 628, 632, 94 S.Ct. 2496, 2499, 41 L.Ed.2d 363 (1974); *New Jersey Welfare Rights Organization v. Cahill,* 411 U.S. 619, 620–621, 93 S.Ct. 1700, 1701, 36 L.Ed.2d 543 (1973) (Per Curiam); *Gomez v. Perez,* 409 U.S. 535, 538, 93 S.Ct. 872, 875, 35 L.Ed.2d 56 (1973) (Per Curiam); *Weber v. Aetna Casualty and Surety Co.,* 406 U.S. 164, 175–176, 92 S.Ct. 1400, 1406–1407, 31 L.Ed.2d 768 (1972); *Glona v. American Guarantee and Liability Insurance,* 391 U.S. 73, 76, 88 S.Ct. 1515, 1517, 20 L. Ed.2d 441 (1968); *Levy v. Louisiana,* 391 U.S. 68, 70–72, 88 S.Ct. 1509, 1510–1511, 20 L.Ed.2d 436 (1968); *Tanner v. Weinberger,* 525 F.2d 51 (6th Cir. 1975). Gender classifications have also been treated as invalid. *See, e. g., Turner v. Dept. of Employment Security,* 423 U.S. 44, 96 S.Ct. 249, 46 L. Ed.2d 181 (1975); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Ginsburg, Gender and the Constitution, 44 U.Cinn.L.Rev. 1 (1975).

The legislative history and the statutory scheme leave no doubt that the exclusive purpose of Congress was to maintain or reunite family units which include United States citizen or permanent resident members. Not a shred of evidence has been produced to support the government's claim that the statutory purpose was to prevent spurious paternity claims by unwed natural fathers. As one of the provision's co-sponsors put it: "This bill is praiseworthy in its fundamental purpose—to reunite families." 103 Cong.Rec. 15497 (1957) (remarks of Senator Pastore). *See also,* H.R.Rep. No. 1199, 85th Cong., 1st Sess. 7–8 (1957); H.R.Rep. No. 1365, 82d Cong., 2d Sess. 29 (1952); 1957 U.S.Code Cong. & Admin.News, pp. 2020–2021; 103 Cong.Rec. 16719 (1957) (remarks of Senator Kennedy); 103 Cong.Rec. 16307 (1957) (remarks of Representative Rodino); *Immigration Service v. Errico,* 385 U.S. 214, 219–220 and n. 9, 87 S.Ct. 473, 477–478, 17 L.Ed.2d 318 (1966); *Nation v. Esperdy,* 239 F.Supp. 531, 534–535 (S.D.N.Y.1965). The courts must distill the general legislative purpose from the legislative history, particularly where it supports a reasonable non-sexist interpretation. *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648–52, 95 S.Ct. 1225, 1233–35, 43 L.Ed.2d 514 (1975). In view of the Congressional purpose to reunite families, there is no rational basis for the statutory classification denying the parent-child status to unwed natural fathers and their illegitimate children while automatically granting it to persons in other family relationships.

Even if Congress were motivated by a desire to discriminate against men and illegitimates in a way harmful to American citizens, the statute could not stand.

It is firmly established that a natural parent, whether father or mother, and a child, whether legitimate or not, have fundamental, constitutionally protected interests in mutual companionship and a life together.

> "The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), 'basic civil rights of man,' *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), and '[r]ights far more precious . . . than property rights,' *May v. Anderson,* 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953)."

*Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). *See also, Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522

(1975); *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 169, 92 S.Ct. 1400, 1403, 31 L.Ed.2d 768 (1972); *Levy v. Louisiana*, 391 U.S. 68, 71, 88 S.Ct. 1509, 1511, 20 L.Ed.2d 436 (1968).

> "It is no less important for a child to be cared for by its . . . parent when that parent is male rather than female. And a father, no less than a mother, has a constitutionally protected right to the 'companionship, care, custody, and management' of 'the children he has sired and raised, [which] undeniably warrants deference and, absent a powerful countervailing interest, protection.' *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)."

*Weinberger v. Wiesenfeld*, 420 U.S. 636, 652, 95 S.Ct. 1225, 1235, 43 L.Ed.2d 514 (1975).

Courts now recognize that unwed fathers, like mothers, often have strong ties of affection to their illegitimate children and desire a continuing relationship with them. *See, e. g., Miller v. Miller*, 504 F.2d 1067 (9th Cir. 1974) (per curiam) (statute permitting adoption without notice to natural father of illegitimate unconstitutional); *People ex rel. Slawek v. Covenant Children's Home*, 52 Ill.2d 20, 284 N.E.2d 291 (1972) (statute precluding father of illegitimate from asserting right to child and denying custody unconstitutional); *In Re Mark T.*, 8 Mich.App. 122, 154 N.W.2d 27, 35 (1967) (custody of illegitimate child awarded to father after mother's release of child for adoption) and cases cited 154 N.W.2d at 33 n. 7, 154 N.W.2d at 35 n. 13; *R. v. F.*, 113 N.J.Super. 396, 273 A.2d 808 (Juv. & Dom.Rel.Ct.1971) (denying father and his natural child of right to see each other deprives them of equal protection); *Application of Juan R.*, 374 N.Y.S. 2d 541 (Fam.Ct.1975) (putative father who has established paternity may bring action to acquire visiting rights without litigating custodial issues); *Stone v. Chip*, 68 Misc.2d 134, 326 N.Y.S.2d 520 (Fam.Ct.1971) (criticiz-

ing rule that mother should have child absent proof she is unfit); *Conley v. Johnson*, 24 N.C.App. 122, 210 S.E.2d 88 (1974) (court may order visitation rights for father of illegitimate despite mother's objection); *Hammack v. Wise*, 211 S.E.2d 118, 121 (W.Va.1975) (father awarded custody of illegitimate child); *State ex rel. Lewis v. Lutheran Social Services*, 59 Wis.2d 1, 207 N.W.2d 826 (1973) (father of illegitimate must be given a hearing on termination of his parental rights); K. Davidson, R. Ginsburg and H. Kay, "Text Note: Illegitimacy and Sex Based Discrimination," Sex Based Discrimination 309–329 (1974); Note, The Emerging Constitutional Protection of the Putative Father's Parental Rights, 70 Mich.L.Rev. 1581 (1972).

State legislatures are systematically revising laws in order to expand the parental rights of unwed fathers. *See, e. g.,* Fla.Stat.Ann. § 63.062 (1974); Hawaii Rev.Laws § 578–2 (Supp.1974); S. H.Ill.Ann.Stat. ch. 4, §§ 9.1–1, subd. E, 9.1–8, 9.1–12a (1975); Burns Ind.Stat. Ann. § 31–3–1–6 (Supp.1975); 19 Me. Rev.Stat.Ann. § 532 (Supp.1975); Mich. Comp.Laws Ann. § 710.3, subd. a (Supp.1973); Minn.Stat.Ann. §§ 259.-24, 259.26, 259.261 (Supp.1975); N.D. C.C.A. § 14–15–20 (1971); R.I.Gen. Laws § 15–7–5 (Supp.1974); Utah Code Ann. § 78–30–4 (Supp.1975); Va.Code § 63.1–225 (Supp.1975); Wash.Rev.Code Ann. §§ 26.32.030, 26.32.085, 26.24.190, 26.28.110 (Supp.1974); Wisc.Stat.Ann. ch. 263, § 48.02(ii), 48.42, and 48.425 (Supp.1975).

This clear trend is consonant with national policy recognized by Congress in its adoption of the Equal Rights Amendment and in its enactment of a series of other statutes designed to overcome outmoded concepts of sex discrimination. *See, e. g.,* Proposed Constitutional Amendment, S.J.Res. 9, 92d Cong., 1st Sess., 118 Cong.Rec. 9568 (1972), H.R. J.Res. 208, 92d Cong., 1st Sess., 117 Cong.Rec. 35782 (1971); Civil Rights Act of 1964, Title VII, 42 U.S.C. §

2000e–5 (1970), Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1970).

The fact that Congress has not yet had the opportunity to winnow through the enormous federal statutory materials to carry out its clear present policy gives added force to the argument that the vestigial remainder of such discrimination embodied in the Act should be closely reviewed by the courts.

Social science literature and empirical studies illustrate why courts, as well as legislatures, no longer allow legislative exclusion of fathers of illegitimates from statutory benefits. Such discrimination is based on an archaic and overbroad stereotype of unwed fathers. Most pregnancies result from exclusive long-term relationships between the father and mother. M. Sauber and E. Rubinstein, Experiences of the Unwed Mother as a Parent 27 (1965); Herzog, "Some Notes About Unmarried Fathers," 1966 Child Welfare 194; Pope, "Unwed Mothers and Their Sex Partners," 29 J. of Marriage & the Family 555, 558 (1967). Many fathers not only continue the relationship with the mother after the child's birth, Sauber and Rubinstein, *supra*, at 53, but also demonstrate genuine interest in and concern for their children. R. Pannor, F. Massarik, and B. Evans, The Unmarried Father 92 (1971); Chaskel, "Changing Patterns in Services for Unmarried Parents," 49 Social Casework 3, 10 (1968); Wessel, "A Physician Looks at Services for Unmarried Parents," 49 Social Casework 11, 12 (1968).

Even those fathers not living with their children assume many of the functions of fatherhood vital to the well-being of children, including financial and emotional support. One statistical study found that between 59% to 83% of these fathers contribute money for their child's expenses and approximately 70% visit their children. Ewer, 1971 Maternal and Child Health Service, Project H–214–2, Characteristics of AAPP Unwed Fathers—A Descriptive Study 2, Table 33 (unpublished, Div. of Research, Maternal and Child Health Service, HSMHA).

An even more striking indication of the strength of the fathers' parental commitment is that an increasing number of illegitimate children are living with their fathers. In 1970 13.9% of the children under eighteen living with single parents, that is, parents who have never been married, lived with their single fathers, as compared to 9.2% in 1960. U.S.Bur. of the Census, 1 U.S. Census of the Population 1970, Characteristics of the Population, Pt. 1, U.S. Summary—Sec. 2, Table 206 (1973); *id.*, U.S. Census of the Population 1960, Table 185 (1963).

The three plaintiff families are good examples of the variety of situations in which strong familial bonds tie illegitimate children to their fathers. Ramon Fiallo's parents, although unmarried, have functioned as a family since the child's birth. Cleophus Warner and the Wilson boys have been supported financially by their fathers since birth. They now depend upon their fathers to be their sole parents because of a mother's choice to live without the child in one case and the mother's death in the other.

The challenged provisions, by excluding only fathers and their illegitimate children from statutory benefits, are based upon an irrebuttable presumption that fathers do not have close family ties with their illegitimate offspring, a presumption belied by the statistical evidence, sociological evaluation of family life, and the facts in the three cases before us. Such a presumption without basis in fact is invalid. *See, e. g., Cleveland Bd. of Ed. v. LaFleur,* 414 U. S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *United States Dept. of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L. Ed.2d 63 (1973). *Cf.* Note, The Irrebuttable Presumption Doctrine in the Supreme Court, 87 Harv.L.Rev. 1534 (1974).

Whatever assumed basis there may once have been for such sexist presumptions no longer exists. Rationality must be viewed in the light of current knowledge. *See Turner v. United States,* 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970).

Even if we accepted the government's contention that the natural fathers of illegitimate children were singled out by Congress to prevent spurious claims, the statutory scheme is not rationally related to that end. See *Jimenez v. Weinberger,* 417 U.S. 628, 634–636, 94 S.Ct. 2496, 2500–2501, 41 L.Ed.2d 363 (1974), where the Court invalidated provisions of the Social Security Act denying children's insurance benefits to a subclass of illegitimate children because the structure of the statute was not reasonably related to the purported purpose, prevention of spurious claims.

Paternity or maternity must be claimed and proven in cases involving legitimate children, legitimated children, step-children and illegitimate children to the satisfaction of immigration and consular officials. The burden of proof of any familial relationship is on the United States citizen or permanent resident and the alien relative. Immigration authorities may require birth certificates, marriage certificates, baptismal certificates, school records, census records, affidavits, letters, photographs, remittances, proof of custody, proof of support, a blood test, personal testimony, and other evidence. 8 C.F.R. § 204.2 (1975). The potential for spurious claims is as great for those included in the statutes' definitions of parent and child as for illegitimate children and their fathers. Women claiming to be mothers of illegitimate children and men claiming to be fathers of legitimated, legitimate, or illegitimate children in a step-child situation, and their respective children, would have as much difficulty or ease in presenting fraudulent proof

as would a man claiming to be the father of an illegitimate child and his child.

And yet, quota restrictions are waived in the case of a step-child or legitimated child if paternity is proven, but a conclusive statutory presumption denies any opportunity of proof in the case of an illegitimate child. A conclusive presumption supposedly established to prevent spurious claims can not be upheld when the potential for fraud is similar for the excluded group and for groups receiving the statutory benefits. *Jimenez v. Weinberger,* 417 U.S. 628, 636–637, 94 S.Ct. 2496, 2501–2502, 41 L.Ed.2d 363 (1974). *Cf. U. S. Dept. of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *Vlandis v. Kline,* 412 U.S. 441, 453–454, 93 S.Ct. 2230, 2237, 37 L.Ed.2d 63 (1973); *Gomez v. Perez,* 409 U.S. 535, 538, 93 S.Ct. 872, 875, 35 L.Ed.2d 56 (1973); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Glona v. American Guarantee & Liability Insurance Co.,* 391 U.S. 73, 76, 88 S.Ct. 1515, 1517, 20 L.Ed.2d 441 (1968). This rigid presumption must be replaced by "more individualized means" of determining the family relationship. *Turner v. Dept. of Employment Security,* 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975).

Practically speaking, the government's contention that the restrictive definition of parent is necessary to prevent spurious claims is nothing more than a plea on behalf of administrative convenience. But it has been clear for some time now that a scheme built upon administrative convenience cannot stand when invidious discrimination results. *See, e. g., Frontiero v. Richardson,* 411 U.S. 677, 690, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973).

### IV. *Conclusion*

Plaintiffs' request for summary judgment in their favor should be granted.